UNITED STATES DISTRICT COURT
EASTER DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

|  |  |  |
|---|---|---|
| KERI BURNETTE, Administratrix, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 6:22-cv-207-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| WHITLEY COUNTY, KENTUCKY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |
| | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Steve Claxton, [R. 92]; the Motion for Summary Judgment filed by Defendants Jessica Mullis, LPN, Tami Hounshell, LPN,[1] and Southern Health Partners, Inc. (hereafter, the "SHP Defendants"), [R. 97]; and the Motion for Summary Judgment filed by Defendants Whitley County, Brian Lawson, Nick Huddleston, Ryan McClure, Roger Henry, Joan Caudell, Jimmy Caudell, and Zane Turner (hereafter, the "Whitley County Defendants"), [R. 121]. Plaintiffs Keri Burnette, as administratrix of the Estate of Aaron Burnette and next friend to Aaron Burnette's minor children, and Andrea Williams, as next friend to one of Aaron Burnette's minor children, filed a response to the three motions. [R. 126]. Defendant Claxton, the SHP Defendants, and the Whitley County Defendants filed replies. [R. 129]; [R. 131]; [R. 133]. This matter is therefore fully briefed and ripe for review. For the reasons set forth herein, the Court will grant in part and

---

[1] In the Amended Complaint, this defendant's name is spelled "Tammi Honshell." *See* [R. 46]. However, in the SHP Defendants' motion, it is spelled "Tami Hounshell." [R. 97]; *see also* [R. 108, p. 4:1–2 (Hounshell Depo., spelling name)]. For purposes of this Memorandum Opinion and Order, the Court will refer to this defendant as Tami Hounshell. To correct the spelling in the caption of this case, however, the parties must file an appropriate motion.

1

deny in part Defendant Claxton's Motion for Summary Judgment, [R. 92]; grant in part and deny in part the SHP Defendants' Motion for Summary Judgment, [R. 97]; and grant in part and deny in part the Whitley County Defendants' Motion for Summary Judgment, [R. 121].

I.    **BACKGROUND**

A.  **Arrest and Booking**

On September 7, 2022, at approximately 6:45 p.m., Aaron Burnette was arrested on charges of fleeing or evading police, disorderly conduct, public intoxication, and possession of drug paraphernalia, among other things. *See* [R. 121-4 (First Citation)]; [R. 121-5 (Second Citation)]. Following his arrest, Burnette was transported to the Whitley County Detention Center. *See generally* [R. 126-3, p. 1 (Facility Admission Report)]. He was formally booked into the facility at approximately 9:59 p.m. *See id.* at 1.

As part of the intake process, a deputy jailer asked Burnette a series of questions on a Standard Medical Questions form. *See* [R. 126-4]. When asked if he "recently ingested potentially dangerous levels of drugs and alcohol," Burnette answered, "No." *Id.* When asked if he had "ever experienced [delirium tremens][2] or other serious withdrawal from drugs or alcohol," he responded, "Yes." *Id.* The deputy jailer also provided additional information on the form, noting that Burnette did not appear to be under the influence of drugs or alcohol. *Id.*

After completing the medical questionnaire, Burnette was photographed and processed. *See* [R. 100, pp. 27:18–25, 28:1–3 (Joan Caudell Depo.)]. Around this time, third shift personnel and deputies began reporting to the jail for the third shift (11:00 p.m. to 7:00 a.m.). *See generally id.* at 26:1–7. Joan Caudell, the officer-in-charge at the facility that evening, arrived at the facility,

---

[2] Delirium tremens "is a life-threatening condition caused by acute alcohol withdrawal." *Greene v. Crawford County*, 22 F.4th 593, 599 (6th Cir. 2022) (quoting *Kindl v. City of Berkley*, 798 F.3d 391, 401 (6th Cir. 2015) (internal quotation marks omitted).

several minutes before her shift. *Id.* at 26:1–9. She first encountered Burnette in the booking area, as he was being photographed. *Id.* at 27:13–15. She noticed that Burnette was shaking, and she asked if he was cold, to which he responded, "no, ma'am, I'm withdrawing." *Id.* at 27:16–17, 28:4–14.

### B.  Events in Cell 203

After completing the booking process, Burnette was placed in cell 203 with at least three other detainees. *See generally* [R. 127 (WCDC Video 2)].[3] Soon after, Ryan McClure, a deputy jailer, clocked in for the third shift, which began at 11:00 p.m. [R. 103, pp. 27:23–25, 28:1–5 (McClure Depo.)]. That evening, McClure was assigned to the isolation ward, i.e., a section of the detention center that houses individual inmates in isolation cells for a variety of reasons, including, among other things, for medical observation. *Id.* at 28:8–21.

Sometime between 11:00 and 11:15 p.m., McClure was notified by staff from the departing shift that the jail had "someone that could potentially be detoxing," and the third shift staff would need to "keep an eye on him." *Id.* at 30:18–19, 31:10–15. Approximately forty-five minutes to an hour later, McClure and other prison staff were alerted to a "knocking" sound coming

---

[3] Plaintiffs have conventionally filed a series of videos. [R. 127 (Notice of Filing)]. These videos are not attached as exhibits to Plaintiffs' response and, as a result, they do not have corresponding record entry identification numbers, such as R. 126-1, R. 126-2, and so on. For convenience, the Court identifies the videos as follows:

> WCDC Video 1 refers to 1_4_9-7-2022 A BURNETTE COMING IN PT
> WCDC Video 2 refers to 1_8_A BURNETTE PLACED IN 203
> WCDC Video 3 refers to 1_8_A BURNETTE TAKE OUT OF 203
> WCDC Video 4 refers to 2_3_A BURNETTE PLACED IN ISO
> WCDC Video 5 refers to 3_14_9-8-2022 A BURNETTE ON AMBULANCE PT
> WCDC Video 6 refers to 5_8_9-8-2022 A BURNETT COURT PT
> WCDC Video 7 refers to 7_6_9-8-2022 A BURNETTE IN 183 PT
> WCDC Video 8 refers to 7_6_BURNETTE IN 183 BEFORE SENT OUT
> WCDC Video 9 refers to 7_6_BURNETTE PLACED IN 183
> WCDC Video 10 refers to the video labeled Jail Arraignment

For each video, the Court refers to the time stamp of the video player, not the time stamp listed on the video recording. Lastly, the Court notes that, with the exception of Video 10, none of the videos have audio.

from cell 203. *Id.* at 31:22–25. Apparently, one of the other inmates in cell 203 had started knocking on the cell door to alert prison staff that Burnette was having a seizure.[4] *Id.* at 32:7–13; [R. 100, p. 29:10–12 (Joan Caudell Depo.)]. Another female guard was the first to respond, followed by Joan Caudell. [R. 100, pp. 29:12–14, 43:1–16]; [R. 127 (WCDC Video 3) at 30:10–35].[5] Joan Caudell testified that, when she entered the cell, she could see Burnette "still shaking," and she believed he was withdrawing. [R. 100, pp. 29:17–20, 44:1–6]. She later testified that Burnette told her that he was withdrawing. *Id.* at 46:2–8. She stepped back into the hallway and called for a male guard. *Id.* at 43:17–19; [R. 127 (WCDC Video 3) at 30:42–54].

A few moments later, McClure entered the cell. [R. 127 (WCDC Video 3) at 31:18]. He testified that he found Burnette "clearly showing signs of detoxing," including "shaking and sweating." [R. 103, p. 32:1–6 (McClure Depo.)]. However, he also testified that he and the other staff members "thought [Burnette] was having a seizure" due to "the shaking that he was producing." *Id.* at 33:23–25, 34:1–3. As a result, McClure followed "seizure protocols" and placed ammonia under Burnette's nose to "try and break him out of the seizure." *Id.* at 34:3–6; [R. 127 (WCDC Video 3) at 3:19–32:04]. When he did this, Burnette spoke, telling the guards he was not seizing, he was detoxing. [R. 103, p. 34:3–7]; *see also* [R. 100, p. 30:4–10 (Joan Caudell Depo.)]. Joan Caudell testified that she then asked Burnette what he was withdrawing from, and he replied that he was withdrawing from heroin and methamphetamine. [R. 100, p. 30:7–9].

Around this time, another deputy jailer, Nick Huddleston, entered cell 203. [R. 127 (WCDC Video 3) at 32:28]. Huddleston had been in the control room monitoring the detention

---

[4] The video footage of cell 203, which does not show the entire cell, does not depict an inmate knocking on the cell door. *See* [R. 127 (WCDC Video 3)].

[5] Due to Burnette's location in the cell and the placement of the video camera, the video footage from cell 203 shows only Burnette's upper body. *See* [R. 127 (WCDC Video 3)].

4

center's video cameras when someone alerted over the radio that someone in cell 203 was having a seizure. [R. 101, p. 24:8–10 (Huddleston Depo.)]. When he entered the cell, Huddleston observed Burnette on the floor "sweating and jerking like he was having a seizure." *Id.* at 26:14–20. He then approached Burnette intending to perform a sternum rub "[t]o try to bring him out of the seizure." *Id.* at 25:16–21; [R. 127 (WCDC Video 3) at 32:40–45]. He also shouted at Burnette, "hey, talk to me," and Burnette responded that he was detoxing from heroin. [R. 101, pp. 24:11–16, 25:20–21, 27:22–25, 28:1–3]. As a result, Huddleston did not perform the sternum rub. *Id.* at 25:16–19. Huddleston then asked Burnette if he wanted to take a shower, and Burnette responded in the affirmative. *Id.* at 28:5–6.

Joan Caudell also testified that she told Huddleston and McClure to put Burnette in the shower "because he had sweated through his oranges," presumably referring to the orange clothes provided by the detention center. [R. 100, p. 30:12–13 (Joan Caudell Depo.)]. At some point, she also "offered [Burnette] medical," but Burnette "said he did not wish to see medical." *Id.* at 30:9–10.

Shortly after Huddleston approached Burnette, the guards exited cell 203. [R. 127 (WCDC Video 3) at 32:57–33:00]. McClure testified that, around this time, he and some other guards gathered in the booking area and discussed "what to do, essentially," though he could not recall who was in the booking room with him. [R. 103, p. 59:4–10 (McClure Depo.)]. He believed Joan Caudell was present, *id.* at 59:20–22, but Joan Caudell testified that she could not recall any such conversation. [R. 100, p. 46:14–21 (Joan Caudell Depo.)].

As to the content of that conversation, McClure testified that "[i]t was more so along the lines of, okay, we are told he was detoxing. What is he detoxing from? Let's try and figure out what . . . we can do to prevent him from possibly overdosing." [R. 103, p. 59:11–16]. He testified,

5

"[W]e were wanting to make sure that we would go the best route of . . . getting him the, the assistance that he would need." *Id.* at 59:16–19. McClure could not remember if anyone discussed contacting the nurses or calling an ambulance. *Id.* at 59:23–25, 60:1–4.

### C. Shower and Transfer to Medical Observation Cell

Approximately five to six minutes after exiting cell 203, Huddleston returned to the cell. [R. 127 (WCDC Video 3) at 38:24]. Burnette ultimately stood and exited the cell, followed by Huddleston. *Id.* at 40:08–16. The video footage from cell 203 also shows Joan Caudell present near the cell door as Burnette walked out. *Id.* at 40:11–13.

Burnette then walked "a couple doors down" to room 208 for a shower, escorted by McClure and Huddleston. [R. 103, p. 34:10–18 (McClure Depo.)]; [R. 127 (WCDC Video 3) at 40:08–40:16]. Huddleston testified that Burnette "walked just fine to the shower." [R. 101, p. 29:14–16 (Huddleston Depo.)]. Huddleston and McClure locked Burnette in room 208 so he could shower, and Huddleston returned to the control room. *Id.* at 29:2–4. Approximately fifteen minutes later, McClure entered the shower and provided Burnette with clean clothes. [R. 103, pp. 34:25, 35:1–2, 36:18–21 (McClure Depo.)]. McClure "noticed [Burnette] was a little unsteady on his feet," *id.* at 35:2, and "was shaking and sweating." *Id.* at 35:14. He also needed assistance getting dressed "because he was shaking." *Id.* at 25:20–21. Given Burnette's unsteadiness and not wanting Burnette to fall, McClure located a wheelchair and "assisted [Burnette] into sitting in the wheelchair." *Id.* at 35:3–4.

However, Joan Caudell testified that McClure only provided a wheelchair because McClure was "trying to be nice." [R. 100, p. 38:8–10 (Joan Caudell Depo.)]. When asked to explain, she stated that Burnette "was very polite, he was able to talk, he was breathing normally," and "literally the only symptoms he had at that point of me speaking to him was the shakes and

sweating profusely." *Id.* at 38:13–17, 40:1–3. She further explained, Burnette had "walked to the shower, and McClure being the nice guard that he is, stuck him in a wheelchair and wheeled him into [cell] 183 even though he could walk." *Id.* at 38:17–19.

Around this time, Joan Caudell called McClure on the "booking phone" and told him to place Burnette in an isolation cell for medical observation. [R. 103, pp. 35:4–10, 37:22–25, 38:1–5 (McClure Depo.)]; [R. 100, p. 30:15–17 (Joan Caudell Depo.)]. In an isolation cell, a guard checks on an inmate every twenty minutes; however, when an inmate is placed in an isolation cell for medical observation (or suicide watch), a guard will check on him every fifteen minutes. [R. 100, p. 32:3–23]. When asked why she directed Burnette to be placed in an isolation cell for medical observation, Joan Caudell responded, "Because he was withdrawing and he was shaking and he was sweating and I wanted to keep an eye on him . . . , [a] close eye on him." *Id.* at 30: 18–25.

Video footage depicts McClure transporting Burnette by wheelchair to isolation cell 183 at approximately 1:33 a.m. on September 8, 2022. [R. 127 (WCDC Video 4) at 2:17–2:43]. Burnette can be seen seated in the wheelchair, slumped over on his left side. *Id.* Around the time McClure approached the door to cell 183, it appears that Burnette began falling or sliding out of the wheelchair, and McClure assisted Burnette in sitting upright. *Id.* at 2:45–51. The video shows that Burnette's feet were shaking as McClure wheeled him into the cell. *Id.* at 3:05. McClure also testified that, at the time they arrived at cell 183, Burnette was still "jerking" or having "jerking like reflexes," but he believed this was normal for "somebody that's detoxing." [R. 103, p. 42:6–13]. Video footage from inside the cell likewise shows Burnette leaning back in the wheelchair with his feet and legs shaking or bouncing. [R. 127 (WCDC Video 9) at 4:40–6:27]. McClure ultimately helped Burnette stand and used both hands to guide Burnette to the bed. *Id.* at 7:43.

McClure testified that this was the first time that he thought Burnette needed medical attention. *Id.* at 40:24–25, 41:1–3, 42:14–21. When asked to explain, McClure stated that previously, in cell 203 and when he was taken to the shower cell, Burnette had been able to respond to verbal communication with full sentences (e.g., "I'm not having a seizure, I'm detoxing."). *Id.* at 41:5–20. However, by the time Burnette was transferred to isolation cell 183, he was only giving "one-word responses." *Id.* at 41:16–20. McClure also noted that Burnette "was sweating a lot more," and he was "shaking and sweating," but when asked by McClure if he was okay, Burnette responded in the affirmative. *Id.* at 41:14–25. As to whether he contacted the nurses or called an ambulance, McClure testified that he "left it up to [his] supervisor [Joan Caudell] to make that ultimate call." *Id.* at 40:1–4. He could not remember, however, if he contacted Joan Caudell to tell her that Burnette likely needed medical assistance. *Id.* at 43:2–7. He testified that, "I know I had the thought [that Burnette needed medical assistance] and I'm sure [Joan Caudell] had the thought as well." *Id.* at 43:4–5.

### D. Medical Observation Cell 183

At approximately 1:34 a.m., McClure wheeled Burnette into isolation cell 183, then stepped out of the cell. [R. 127 (WCDC Video 9) at 4:40–5:00]. Video footage shows that, within a couple of minutes, Burnette was slumped back in the wheelchair, with his feet and legs shaking and bouncing. *Id.* at 6:27–7:25. McClure reentered the cell with a mat for the bed. *Id.* at 7:25. McClure helped Burnette stand and transfer to the bed. *Id.* at 7:43–52. McClure eventually exited the cell, and for the next several hours, Burnette lay on the bed, fidgeting and shaking.[6] *Id.* at 8:00–11:25:07. It is unclear if he slept. *See generally id.*

McClure was the guard in charge of the isolation cells during this time. [R. 103, p. 28:8–

---

[6] Plaintiffs suggest that Burnette may have vomited on the floor during this time; however, review of the video footage clearly shows that he knocked over his lunch tray, spilling its contents on the floor.

13 (McClure Depo.)]. He testified that, every fifteen or twenty minutes, he "would do [his] best to go in and scan and look at the inmates and ensure . . . they were alright." *Id.* at 29:10–14.[7] As to Burnette specifically, McClure testified that he "checked in on him" throughout the remainder of his shift, and he would ask Burnette "how he was doing," and Burnette would respond that "he was okay." *Id.* at 73:1–14.

McClure also testified that he spoke with Joan Caudell periodically throughout the remainder of his shift. *See, e.g.*, *id.* at 73:14–25, 74:1–6. She would ask McClure, "how is he?" and McClure would respond that "he's about the same as he was when . . . he was in [cell] 203," and he was "breathing, shaking, and sweating." *Id.* at 46:3–7, 47:4–7. At no point during these conversations did McClure suggest to Joan Caudell that the nurses or an ambulance needed to be called. *Id.* at 47:10–13. Instead, he "left it up to" Joan Caudell to decide whether to contact medical personnel. *Id.* at 47:14–21. Joan Caudell also testified about these conversations, similarly stating that she spoke with McClure "several times" and would ask "how [Burnette] was doing," and McClure would say "he was doing fine." [R. 100, pp. 33:20–25, 34:1–8 (Joan Caudell Depo.)].

Also during this time, the isolation inmates were "checked via control," meaning the control room operator observed the camera footage from the cells in the control room "and [made] sure that everyone [was] doing, you know, what they're supposed to be doing." [R. 103, p. 29:16–23 (McClure Depo.)]. Huddleston was the control room operator during the 11:00 p.m. to 7:00 a.m. shift. [R. 101, p. 21:13–20 (Huddleston Depo.)]. He testified that he could not recall anything else about Burnette after he was placed in the isolation cell. *Id.* at 37:14–16. Joan Caudell testified that, when she had to occasionally enter the control room during her shift, she would check on

---

[7] McClure testified that he checked on the medical isolation inmates every twenty minutes; however, Joan Caudell testified that he did so every fifteen minutes, per detention center policy. *See* [R. 100, p. 33:8–19 (Joan Caudell Depo.)].

Burnette, but she never saw anything that concerned her. [R. 100, pp. 34:9–25, 35:1].

### E. Nurses' Arrival and Shift Change

Around 6:30 a.m. on September 8, 2022, Tami Hounshell and Jessica Mullis, two nurses employed by Southern Health Partners, Inc. to perform medical services at the detention center, arrived for their shift. [R. 107, pp. 18:24–25, 19:1–2 (Mullis Depo.)]; [R. 108, pp. 15:13–22, 30:10–17 (Hounshell Depo.)]. Typically, when the nurses arrive, they would go to booking to "get the papers from where everybody booked in," and to see if there were any overnight issues or people that they should be concerned about. [R. 108, p. 19:11–16]. For example, they would "go through everybody's intake paperwork to see if they answered any yes questions." *Id.* at 19:18–21. Regardless of the answers, however, the detention center required all inmates to be seen within twenty-four hours of their arrival. *Id.* at 21:2–25. The nurses would then gather a list of who they needed to see that day and prepare for "med pass" at 7:00 a.m. *Id.* at 19:16–23. After distributing medications, which took about an hour to an hour and a half, they would go back to booking and start "seeing the people up there who need to be seen," then "go to the med room and [] start working on the sick call list." *Id.* at 19:23–25, 20:1–10; *see also* [R. 107, p. 19:2–8].

As for Burnette, Hounshell testified that he had not been placed on the sick call list, the nurses were not told of any incidents of a medical nature involving Burnette, and they were not told that he had been transferred to an isolation cell for medical observation. [R. 108, pp. 30:17–25, 31:1–4]. Nevertheless, based on his answer to the question about delirium tremens on the medical questionnaire, she and Mullis placed Burnette "on the list," meaning they intended to see him that day. *Id* at 20:8–20.

However, Huddleston testified that he was "pretty sure" McClure spoke with the nurses about Burnette at the start of their shift. [R. 101, pp. 31:21–25, 32:1–2 (Huddleston Depo.)]. He

later testified that he was clocking out of his shift when he overheard McClure "telling medical about Mr. Burnette, that he was detoxing off heroin and that [Mullis] needed to check on him and he told her what cell he was in." *Id.* at 40:6–12. According to Huddleston, McClure told Mullis "that she probably needed to check on him this morning—that morning, first thing." *Id.* at 41:8–15. McClure testified that he could not recall this conversation, but it was "something that [he] potentially could have done." [R. 103, p. 48:19–25, 49:1–6 (McClure Depo.)]. Typically, he explained, he would "notify basically anyone that works at the jail of any major changes just out of courtesy." *Id.* at 74:16–22.

Joan Caudell also testified that she told both Hounshell and Mullis about Burnette when they arrived for their shift, around 6:30 a.m. [R. 100, p. 35:3–19 (Joan Caudell Depo.)]. She testified that she "gave them all of the intake paperwork" and the medical questionnaires, and she let them know that "a male [had] come in who was withdrawing from heroin and meth and he needed to be the first one that they saw." *Id.* at 35:3–10. She also testified that she told Roger Henry "to make sure cell 183 got seen because they were only in there for medical observation for withdrawals." *Id.* at 36:2–15.

At approximately 7:00 a.m., Joan Caudell, McClure, and Huddleston clocked out of their shifts. *See, e.g.*, *id.* at 26:6–7 (stating that third shift was 11:00 p.m. to 7:00 a.m.). Around this time, Steven Claxton clocked in for his shift. [R. 105, p. 70:10–13 (Claxton Depo.)]. As part of his duties, he took over the isolation cells. *Id.* at 73:12–16. As to Burnette, Claxton testified that, every fifteen minutes, he would raise the flap on the cell door, "holler at him" and "kind of kick the door to get his attention," and "a lot of times he would wake up, he'd raise up and look." *Id.* at 74:2–6. Claxton testified that he observed Burnette "sweating a lot," but he did not observe any problems with Burnette's breathing. *Id.* at 92:15–21.

Mullis testified that, sometime between 10:30 and 11:30 that morning, while she was "doing [] other intakes in the booking area," she asked a female booking officer, Larissa King, if she could see the two inmates in isolation. [R. 107, pp. 46:23–25, 47:1 (Mullis Depo.)]. She was told, however, that the inmates "would be going to court and [Mullis] would have to wait until after court to see them." *Id.* at 46:3–5; *see also* [R. 108, pp. 36:1–11 (Hounshell Depo.)]. King testified that she did not recall any such conversation with Mullis, and she would not have had the ability to prevent medical personnel from seeing an inmate in the isolation cells. *See* [R. 99, pp. 52:22–25, 53:1–25, 54:1–8 (King Depo.)]. Hounshell also testified that, at some point, Mullis tried again to see Burnette but was told by Claxton that she would have to wait until he got back from court. [R. 108, pp. 34:14–18, 35:7–8, 38:12–20 (Hounshell Depo.)].

### F. Hallway Interactions and Video Arraignment

At approximately 1:11 p.m., Steve Claxton, a deputy jailer who took over McClure's duties in the isolation ward, entered isolation cell 183. [R. 127 (WCDC Video 8) at 10:50]. Jimmy Caudell, another deputy jailer, was nearby, either in the hallway or standing in or near the doorway to the cell. [R. 104, pp. 36:21–25, 37:1 (Jimmy Caudell Depo.)].

Video footage from cell 183 shows that Burnette, who had been lying on the bed, sat up and appeared to talk with Claxton. [R. 127 (WCDC Video 8) at 10:56–11:43]. According to Claxton, Burnette asked him where he was going, and Claxton replied that he was going to his video arraignment. [R. 105, p. 83:7–9 (Claxton Depo.)]. Claxton testified that Burnette "was talking and everything, normal." *Id.* at 83:19–22. However, video footage shows Burnette's legs shaking during this time. *See, e.g.*, [R. 127 (WCDC Video 8) at 11:45–48]. Claxton eventually grabbed Burnette's sleeve and helped pull him to a standing position. *Id.* at 11:48–53. Claxton led Burnette out of isolation cell 183 with one hand grabbing the back of Burnette's shirt. *Id.* at 11:53–

12

12:04.

Jimmy Caudell testified that, at this time, Burnette was "sweating profusely" and he was "kind of shaky," or "pretty shaky and kind of moving around a little bit, his body." [R. 104, pp. 34:24–25, 35:1–4, 37:5–13 (Jimmy Caudell Depo.)]. He and Claxton asked Burnette "what was wrong with him," and Burnette told them "he was detoxing from heroin and meth" and "he would be okay." *Id.* at 36:12–16; 39:1–4. Jimmy Caudell also testified that Burnette "did walk on his, on his own willpower." *Id.* at 37:13.

Claxton and Caudell escorted Burnette to a hallway, where several other inmates were lined up waiting for their video court appearances. *See* [R. 127 (WCDC Video 6) at 6:55–7:00]. Video footage from that hallway shows Claxton walking beside Burnette, with one hand on Burnette's arm and the other firmly grasping the back of Burnette's shirt. *Id.* As Burnette stood in line, he leaned against the wall, facing the wall with his head pressed against it, and Claxton kept at least one hand on Burnette's back at all times. *See id.* at 7:00–10:08. Several times, Claxton placed both hands on Burnette's back. *Id.*

Burnette was the only inmate in the line that was personally escorted and physically assisted by a guard in this way. *Id.* However, Claxton testified that "I just had ahold of him because I do everybody that way," because in the past, inmates coming out of isolation would "take off running." [R. 105, pp. 85:1–2, 87:21–23, 88:2–3, 89:3–22 (Claxton Depo.)]. He also testified that he was told to make the inmates face the wall. *Id.* at 88:4–11. However, Burnette was the only inmate in the hallway facing the wall. *See generally* [R. 127 (WCDC Video 6)].

After approximately three minutes in the hallway, Claxton guided Burnette down the hall to the video arraignment room. [R. 127 (WCDC Video 6) at 10:08]. At this time, the following defendants were also in the hallway: Jailer Brian Lawson, Zane Turner, Jimmy Caudill, Jessica

13

Mullis, and Tami Hounshell. *See, e.g.*, [R. 98, p. 62:7–9 (Lawson Depo.)]; [R. 106, p. 31:8–18 (Turner Depo.)]; [R. 104, p. 42:15–24 (Jimmy Caudill Depo.)]; [R. 107, p. 79:5–8 (Mullis Depo.)]; [R. 108, pp. 36:23–25, 37:1–12 (Hounshell Depo.)]. Lawson testified that he had gone to the hallway to observe Burnette because he had just been informed that two inmates, including Burnette, were "acting out of the normal a little bit." [R. 98, pp. 59:25, 60:1–12, 4–16 (Lawson Depo.)].

As Claxton led Burnette down the hallway, he kept one hand on Burnette's arm and one hand on Burnette's back. [R. 127 (WCDC Video 6) at 10:08]. However, he testified that he believed Burnette "had the ability to walk himself into [the video arraignment] room without [his] assistance." [R. 105, p. 90: 1–4 (Claxton Depo.)]. Hounshell testified that she saw Claxton "holding [Burnette] up." [R. 108, pp. 36:23–25, 37:1–4 (Hounshell Depo.)]. Mullis testified that she remembered Claxton standing beside Burnette but did not "recall him holding him." [R. 107, p. 32:14–19 (Mullis Depo.)]. Mullis also testified that, around this time, she and Hounshell asked Jimmy Caudell if Burnette needed to be seen, and he told them that Burnette was going to his arraignment. *Id.* at 31:21–25, 32:1–8.

Burnette, assisted by Claxton, entered the video arraignment room and was placed in a chair at approximately 1:18 p.m. [R. 127 (WCDC Video 6) at 10:13]; [R. 127 (WCDC Video 10) at 00:06–12]. Zane Turner, a deputy jailer and assistant court coordinator, stood in the doorway. [R. 106, p. 44:19–23 (Turner Depo.)]. Jimmy Caudill was also in the room, standing to Burnette's left. [R. 104, p. 40:12–13 (Jimmy Caudell Depo.)]. Jailer Lawson was nearby. [R. 98, p. 63:3–6, 16–19 (Lawson Depo.)]. Meanwhile, Mullis and Hounshell decided to take their lunch breaks. [R.107, p. 33:5–16 (Mullis Depo.)]; [R. 108, p. 38:21–23 (Hounshell Depo.)].

As Burnette sat down, the judge asked the guards, "Somebody tell me what's going on with

14

him, is he intoxicated or what's going on?" [R. 127 (WCDC Video 10) at 00:20–24]. Jimmy Caudell, responded that Burnette was in withdrawal. *Id.* at 00:24–31; [R. 104, pp. 41:9–23, 75:4–8 (Jimmy Caudell Depo.)]; [R. 105, p. 94:9–11 (Claxton Depo.)]. The judge then entered a "not guilty" plea on Burnette's behalf, set a pretrial conference date, and set bond. [R. 127 (WCDC Video 10) at 00:31–57].

The entire arraignment proceeding took just under one minute, during which time Burnette sat, mouth agape, and did not speak. *See generally* [R. 127 (WCDC Video 10)]. Claxton also testified that Burnette's mouth was open during the arraignment, and Claxton did not believe he was having breathing difficulties, but he was "sweating a lot." [R. 105, p. 94:17–21 (Claxton Depo.)]. Claxton also testified that he did not believe Burnette had the ability to understand the judge's questions because "[he] was probably withdrawing." *Id.* at 95:20–25, 96:1.

Claxton later admitted that, after watching Burnette's interaction with the judge and in the hallway, he had concerns about Burnette's health and wellbeing. *Id.* at 96:2–8. When prompted to explain, he stated that Burnette "was sweating real bad." *Id.* at 96:9–10. When asked if there were any other indications of a potential medical problem, he pointed to "[t]he way he was breathing there in the video arraignment." *Id.* at 96:14–16. According to Claxton, as he escorted Burnette back down the hallway towards isolation cell 183, he and Jimmy Caudell discussed Burnette's condition, and Claxton advised that he would let Roger Henry know. *Id.* at 98:1–15.

### G. Lawson's Discussion with Medical Staff

Jailer Lawson also developed concerns about Burnette after observing him in the hallway and in the video arraignment room. While he could not recall specifics, Lawson testified that "something wasn't right" and "wasn't normal." [R. 98, p. 62:18–21, 65:1–3 (Lawson Depo.)]. He could not determine whether Burnette "was high [or] whether he was going through withdrawals."

15

*Id.* at 65:3–5. As a result, Lawson notified medical staff that Burnette needed to be seen, though he "didn't think that it was a medical emergency where 911 needed to be called." *Id.* at 65:3–10. He testified that, at approximately 1:32 p.m.,[8] he went "to the front office where the break room was and notified medical of the situation." *Id.* at 67:25, 68:1–6. When he entered the break room, Mullis was eating her lunch and Hounshell was just outside the break room door, smoking. *Id.* at 69:21–25, 70:1. While Lawson, again, could not recall specifics, he testified that he may have smoked a cigarette with Hounshell, but he "did notify both of them." *Id.* at 70:2–3. He testified that he said something along the lines of, "hey we got two inmates back there not acting right, you all need to check them out or could you check them out." *Id.* at 84:10–14. When asked if he "state[]d that there was any urgency to the situation," he replied, "I just asked if they would go check them." *Id.* at 85:15–21.

Mullis testified that Lawson stood outside the door smoking with Hounshell, and when Hounshell came back inside, she told Mullis that they needed to pull the two intake forms for Burnette and the other inmate. [R. 107, pp. 33:16–19, 35:2–7 (Mullis Depo.)]. Hounshell testified that she was smoking when Lawson told her that they needed to see Burnette, at which point Hounshell advised Lawson that Mullis had attempted to see Burnette twice but was unable to do so. [R. 108, pp. 34:19–25, 35:1–8 (Hounshell Depo.)]. According to Hounshell, Lawson then told her that Burnette "needed to be seen as soon as [they] got back from break." *Id.* at 35:8–10.

### H. Medical Emergency and Death

Meanwhile, Claxton placed Burnette back in isolation cell 183 at approximately 1:20 p.m. [R. 127 (WCDC Video 8) at 20:04–14]. The Court notes that, despite Claxton's testimony that he

---

[8] While Lawson could not recall the exact time, or whether he went directly to the break room after Burnette's arraignment, he was shown video footage from the break room, which showed him walking into the room at approximately 1:32 p.m. *See* [R. 98, p. 84:5–6 (Lawson Depo.)]. That video footage has not been provided to the Court.

held on to all inmates so they would not take off running in the hallway, he continued to hold Burnette by the arm and back of his shirt while in the cell, and guided Burnette to a stool in the corner of the cell. *Id.* Claxton testified that he then went to Henry's office to tell him that Burnette "probably needed to see medical." [R. 105, pp. 96:19–25, 97:1–10 (Claxton Depo.)]. According to Claxton, Henry advised Claxton that he would inform the nurses. *Id.* at 100:4–8.

Claxton testified that he continued to check in on Burnette every fifteen or twenty minutes as required. *Id.* at 100:19–25, 101:3. To check on him, Claxton would raise the flap covering an opening on the cell door; he did not go into the cell. *Id.* at 101:4–18. Claxton testified that Burnette was "kind of fidgety" and was sweating, but his condition did not seem to worsen "right off." *Id.* at 101:22–25, 102:1–5. However, at approximately 1:29 p.m., Burnette moved from the stool to the floor. [R. 127 (WCDC Video 8) at 29:30]. By 1:34 p.m., Burnette was lying on the floor, still fidgeting and shaking. *Id.* at 34:24. At approximately 1:37 p.m., Burnette vomited on the floor. *Id.* at 37:25. By approximately 1:54 p.m., Burnette was lying on the floor, largely motionless. *See, e.g.*, *id.* at 54:20.

At approximately 1:55 p.m., Claxton entered isolation cell 183. *Id.* at 55:30. He testified that Burnette "was laying there with his eyes open and he was breathing and stuff, but he was just like making a grunting sound." [R. 105, p. 102:17–21 (Claxton Depo.)]. He called for assistance, and Jimmy Caudell arrived with a wheelchair. *Id.* at 102:17–18; [R. 127 (WCDC Video 8) at 5:35–37]; [R. 104, p. 46:10–11 (Jimmy Caudell Depo.)]. Mullis, who was in the booking preparing to examine Burnette's intake form, saw Caudell retrieving the wheelchair and asked if he needed assistance, and he responded in the affirmative. [R. 107, pp. 56:20–25, 57:1–25 (Mullis Depo.)]. Mullis testified that Caudell was not in a hurry and "was taking his time with the wheelchair." *Id.* at 58:3–6, 60:18–20. Mullis gathered her supplies while Caudell returned to the cell with the

17

wheelchair. *Id.* at 8–15. Claxton and Caudell were unable to lift Burnette into the wheelchair. [R. 127 (WCDC Video 8) at 55:39–56:45].

At approximately 1:58 p.m., Mullis arrived at isolation cell 183 and advised that it was possible Burnette was overdosing. [R. 105, p. 102:21–24 (Claxton Depo.)]; [R. 127 (WCDC Video 8) at 58:12]. She administered Narcan and attempted to take Burnette's vitals. [R. 127 (WCDC Video 8) at 58:32–1:03:35]; [R. 107, p. 37:7–11 (Mullis Depo.)]. Other jail staff also arrived on the scene, including Henry. [R. 102, p. 27:13–23 (Henry Depo.)]. Hounshell also arrived at isolation cell 183 after the first dose of Narcan had been administered. [R. 108, p. 43:1–10 (Hounshell Depo.)].

Burnette was eventually transported to booking, where Mullis administered another dose of Narcan. [R. 127 (WCDC Video 8) at 1:03:45–1:04:28]; [R. 107, p. 61:14–17 (Mullis Depo.)]. Burnette was then transported by ambulance to a hospital, where he died at 5:16 p.m. on September 9, 2022. *See* [R. 92-2 (Baptist Health Records)]; *see generally* [R. 127 (WCDC Video 5)]. An autopsy was performed, and the medical examiner found that his death was "due to the combined toxic effects of methamphetamine, fluorofentanyl, and fentanyl (with 4-ANPP) in the setting of chronic substance abuse." [R. 126-13 (Autopsy Findings, Final Diagnosis)].

## I. The Present Lawsuit

On November 2, 2022, Plaintiffs filed the present lawsuit, naming as defendants Whitley County, Brian Lawson, Steve Claxton, and other unknown defendants. [R. 1]. On August 25, 2023, Plaintiffs filed their Amended Complaint. [R. 46]. The Amended Complaint names as defendants Whitley County, Brian Lawson, Steve Claxton, Nick Huddleston, Ryan McClure, Roger Henry, Joan Caudell, Zane Turner, Jimmy Caudell, Southern Health Partners, Inc., Tami Hounshell, Jessica Mullis, "Unknown Individual Defendants 1–3," and "Unknown Entity Defendants 1–3."

[R. 45, pp. 1–3]. Defendant Claxton and the individual Whitley County Defendants are each sued in their individual and official capacities. *See id.*

In their Amended Complaint, Plaintiffs allege the following causes of action: a claim under 42 U.S.C. § 1983 for deliberate indifference to Burnette's serious medical needs in violation of the Eighth, Tenth, and Fourteenth Amendments (Count I, against all Defendants); negligence and gross negligence (Count II, against all Defendants); wrongful death under Kentucky Revised Statute ("KRS") § 411.130 (Count III, against all Defendants); outrage, or intentional infliction of emotional distress (Count IV, against all Defendants); vicarious responsibility and respondeat superior liability (Count V, against Defendants Whitley County, Brian Lawson, and Southern Health Partners, Inc.); and a claim for loss of parental consortium[9] (Count VI, against all Defendants). [R. 46, ¶¶ 75–93]. Plaintiffs seek compensatory damages and punitive damages, and they specifically reference "funeral expenses and the loss of Aaron Burnette's power to labor and earn money." *Id.* ¶¶ 94–95.

The parties thereafter engaged in extensive discovery. Through three separate motions, Defendants now seek summary judgment on most of the above-listed claims. [R. 92]; [R. 92]; [R. 121]. Those motions are fully briefed and ripe for review. [R. 126]; [R. 129]; [R. 131]; [R. 133].

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler*

---

[9] This claim arises under Kentucky common law. *See generally Johnson v. Basil as Next Friend of Johnson*, 584 S.W.3d 777, 782 (Ky. Ct. App. 2019) ("[A] loss of parental consortium claim is a common-law cause of action.").

19

*v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents,

20

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

### III.   ANALYSIS

#### A. Plaintiffs' § 1983 Claims Against Defendant Claxton and the Individual Whitley County Defendants, in Their Individual Capacities

In their First Amended Complaint, Plaintiffs allege that each of the defendants, in their individual capacities, are liable under Count I, the § 1983 claim, for showing deliberate indifference to Burnette's serious medical needs in violation of the Eighth, Tenth, and Fourteenth Amendments. [R. 46, ¶¶ 75–82]. The Court turns first to Defendants Claxton and the individual Whitley County Defendants, to the extent they are sued in their individual capacities.

To prevail on a § 1983 claim, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 384 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015)) (internal quotation marks omitted). The second of these requirements is uncontested in this case. At issue, however, is whether these defendants violated Burnette's constitutional rights.

As an initial matter, the Court must clarify which constitutional rights are at issue. In the

"Jurisdiction and Venue" section of their First Amended Complaint, Plaintiffs reference the Fourth, Eighth, and Fourteenth Amendments. [R. 46, ¶ 2]. Then, in Count I of the First Amended Complaint, Plaintiffs cite the Eighth, Tenth, and Fourteenth Amendments. *Id.* ¶ 80. In their response brief, however, they address only the Eighth and Fourteenth Amendments. [R. 126, p. 30]. As such, to the extent Plaintiffs intended to raise a § 1983 claim based on violations of the Fourth or Tenth Amendment, the Court understands Plaintiff has abandoned such claims or theories.[10]

Still, the defendants argue that the Eighth Amendment is inapplicable here. *See* [R. 92-1, pp. 9–10]; [R. 121-1, pp. 39–40]. As discussed in more detail below, the Eighth Amendment provides protection to convicted criminals, while the Fourteenth Amendment's Due Process Clause provides similar protections to pretrial detainees like Burnette. Accordingly, the relevant constitutional provision in this case is the Fourteenth Amendment. *See, e.g.*, *Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Phillips v. PTS of America, LLC*, 3:17-CV-603-CHB, 2021 WL 1220997, at *6 n.6 (W.D. Ky. Mar. 31, 2021).

Having clarified these points, the Court first turns to Defendant Claxton and the individual Whitley County Defendants' qualified immunity arguments as to the § 1983 claim, to the extent they are sued in their individual capacities.

### 1. Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

---

[10] This conclusion is further supported by the text of the amendments themselves, as the Fourth Amendment protects from unreasonable searches and seizures, and the Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *See* U.S. Const. amends. IV, X.

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601–02 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). To evaluate a qualified immunity defense, the Court considers two questions:

> First, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. If the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer is entitled to qualified immunity. If, however, the facts alleged are sufficient to establish a constitutional violation, then the Court must determine whether the particular right allegedly violated was clearly established at the time the violation occurred.

*Id.* at 602 (internal citations omitted).

Thus, in considering the defendants' qualified immunity argument, the Court must first determine if the facts, when viewed in the light most favorable to Plaintiffs, demonstrate that Defendant Claxton and the individual Whitley County Defendants violated Burnette's constitutional rights.

### a. Constitutional Violation

As an initial matter, the Court must identify the correct legal test to apply to Burnette's deliberate indifference claims. Defendants repeatedly reference the test applicable to convicted prisoners under the Eighth Amendment, *see, e.g.*, [R. 92-1, pp. 11–13]; [R. 121-1, pp. 40–42], while Plaintiffs address the test applicable to pretrial detainees under the Fourteenth Amendment. [R. 126, pp. 30–31].

The Eighth Amendment prohibits prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious medical needs. *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estell v. Gamble*, 429 U.S. 97, 104 (1976)). Pretrial detainees are afforded the same protections

23

under the Fourteenth Amendment. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)); *Revere*, 463 U.S. at 244; *see also Hehrer v. Cnty. of Clinton*, 161 F.4th 955, 962 (6th Cir. 2025) ("While the Eighth Amendment's ban on 'cruel and unusual punishments' protects convicted prisoners, the Fourteenth Amendment's ban on 'depriv[ations]' of 'life' or 'liberty' 'without due process of law' protects pretrial detainees." (citations omitted)).

For many years, a pretrial detainee's Fourteenth Amendment deliberate indifference claim was analyzed "under the same framework for deliberate-indifference claims brought by prisoners pursuant to the Eighth Amendment, including claims of inadequate medical care." *Martin v. Warren Cnty.*, 799 F. App'x 329, 337 (6th Cir. 2020) (citation omitted); *see also Helphenstine v. Lewis Cnty.*, 60 F. 4th 305, 315 (6th Cir. 2023) ("Until recently, we analyzed both pretrial detainees' and prisoners' claims of deliberate indifference 'under the same rubric.'" (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021))). Under this older test, a prison official's deliberate indifference violates a pretrial detainee's constitutional rights when the official intentionally denies or delays access to medical care for a serious medical need. *Blackmore*, 390 F.3d at 895 (citing *Estelle*, 429 U.S. at 104). This test, in turn, has both an objective and subjective component. *Id.* (citations omitted). The objective component requires the plaintiff to show an objectively serious medical need, while the subjective component requires that (1) the individual defendant subjectively perceived facts from which to infer a substantial risk to the detainee; (2) he or she did in fact draw that inference; and (3) he or she then disregarded that risk. *Jackson v. Wilkins*, 517 F. App'x 311, 317 (6th Cir. 2013) (citation omitted); *see also Hehrer*, 161 F.4th at 963 (discussing this test).

However, in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021), the Sixth Circuit amended this test for pretrial detainees. Specifically, the Sixth Circuit "lower[ed] the subjective

24

component from actual knowledge to recklessness." *Helphenstine*, 60 F.4th at 316; *see also Hehrer*, 161 F.4th at 963 ("[W]e adopted an easier-to-meet subjective element for pretrial detainees under the Fourteenth Amendment" in *Brawner*." (citation omitted)). To satisfy this modified subjective element, a pretrial detainee must prove that a defendant "acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836). In other words, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Here, the incident giving rise to this lawsuit occurred in September 2022, after the Sixth Circuit issued its decision in *Brawner*, and there is no dispute that Burnette was a pretrial detainee at all relevant times.[11] Accordingly, to determine if the defendants were deliberately indifferent to Burnette's serious medical needs in violation of his Fourteenth Amendment rights, the Court must consider (1) whether Burnette had a sufficiently serious medical need; (2) whether each defendant's action (or lack of action) was intentional (i.e., not accidental), and that defendant either intentionally ignored Burnette's serious medical need, or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Burnette], even though a reasonable official in [that defendant's] position would have known that the serious medical need posed an excessive risk to [Burnette's] health or safety." *Id.* at 597.

### i.  Objective Prong (Serious Medical Need)

To satisfy the objective element of this two-part test, "a plaintiff must identify a serious medical

---

[11] Under these circumstances, the Court is at a loss as to why Defendant Claxton and the Whitley County Defendants rely on the pre-*Brawner* test in their motions, and the Court is further concerned by their continued reliance on this outdated test in their reply briefs, even when faced with Plaintiffs' response brief and the SHP Defendants' motion, both of which cite to the correct test. *See* [R. 97-1, pp. 5–6]; [R. 126, pp. 30–31].

need, which is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Martin*, 799 F. App'x at 338 (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks omitted)). If a medical need is "non-obvious," then it typically must have been "diagnosed by a physician as mandating treatment," and "proven by verifying medical evidence." *Hodges v. Abrams*, 138 F.4th 980, 988 (6th Cir. 2025) (quoting *Blackmore*, 390 F.3d at 897, 898).

As the Sixth Circuit has explained, "[t]here are a number of ways to show that the need for a doctor's care was sufficiently obvious." *Grote v. Kenton Cnty.*, 85 F.4th 397, 406 (6th Cir. 2023). "For one, external signs of distress can indicate to a lay person that a detainee has a serious medical need." *Id.* (citations omitted). Indeed, the Sixth Circuit has held "on numerous occasions" that "drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen." *Id.* (collecting cases). Moreover, "jailers' responses to a detainee's symptoms or complaints may also show that jailers recognized a serious medical need." *Id.* (citation omitted). For example, "that jailers 'deem[] [a detainee's] condition sufficiently serious to place him in an observation cell' tends to show a sufficiently serious medical need." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 318 (6th Cir. 2023) (quoting *Blackmore*, 390 F.3d at 899).

The record in the present case clearly demonstrates that Burnette presented an objectively serious medical need. "Although the [individual Whitley County Defendants] were not aware that [Burnette] had ingested a lethal amount of [drugs], Burnette manifested clear and undeniable signs of distress" while in cell 203 and in the several hours that followed. *Grote*, 85 F.4th at 407. In cell 203, for example, he was shaking and twitching so badly that multiple guards believed he was having a seizure, and he was sweating so profusely that he sweat through his clothing and needed a shower. After his shower, he continued shaking and fidgeting, and at least one guard testified that he was

unsteady on his feet, needed help getting dressed, and required a wheelchair to be transferred to the observation cell. By this point, he was also giving only one-word responses when questioned. And Joan Caudell ordered him to be placed in an isolation cell, believing he needed medical observation. In the isolation cell, he was shaking, fidgeting, and unable to lie still throughout the morning and early afternoon. There may be a factual dispute as to whether he then needed assistance to walk to and stand in the hallway for his arraignment, but regardless, the record indicates that, by the time he appeared for his video court appearance, he was unable to understand the judge's questions. He continued shaking and sweating, and his breathing appeared labored. Indeed, "nearly every corrections officer with whom [Burnette] interacted noticed that [Burnette] was experiencing some sort of medical issue, even if the cause was unknown." *Id.* at 407. And "[i]f there were any doubt about [Burnette's] distress, [multiple guards] confirmed that [they and others] harbored concerns based on [Burnette's] behavior." *Id.*

In sum, "[t]hese signs constitute the hallmarks of an objectively serious medical need. They were signs of outward distress; clear indications of *either* a drug overdose or severe withdrawal; and the deputies themselves recognized the need for [medical assistance] and participated in the medical observation" of Burnette in the isolation cell. *Grote*, 85 F.4th at 407 (internal citations omitted). And while some of the individual Whitley County Defendants may deny that they subjectively recognized the need for medical assistance, the Sixth Circuit has held that "drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen." *Id.* at 406. The Court therefore finds that the objective component has been satisfied. *See generally id.* at 407 (discussing "undeniable signs of distress," including persistent twitching, inability to sit still, sweating, shaking, and hyperventilating, and finding objective component satisfied).

The Court makes one final point regarding the objective component. As to this element, the Whitley County Defendants misrepresent the law. First, they rely on the guards' *subjective* beliefs as

27

to whether Burnette was suffering from a serious medical need. *See* [R. 121-1, p. 41]. In this sense, they improperly conflate the subjective component with the objective. *See Sturgill v. Mutrespaw*, No. 1:19-cv-594, 2024 WL 3925663, at *10 n.19 (S.D. Ohio Aug. 22, 2024) ("[T]he 'obviousness' of a plaintiff's medical condition is judged on purely objective symptoms that—if observed—would be 'obvious' to anyone. To hold that the symptoms must have been observed and obvious to [the] [d]efendants improperly conflate the subjective element with the objective." (emphasis in original)).

Next, they represent that the Sixth Circuit "cautions against finding that the objective component is met when symptoms result in death." *Id.* at 42. While they fail to cite any authority for this statement, the Court understands they are likely referring to *Hodges v. Abrams*, 138 F.4th 980 (6th Cir. 2025). In that case, the detainee had swallowed a baggie of drugs, but exhibited virtually no signs of distress until he collapsed in his cell. *Id.* at 983–86. The plaintiff argued that his condition, caused by his ingestion of the drugs, "was necessarily obvious because it led to his death." *Id.* at 990. The Sixth Circuit disagreed, noting that "[d]eath *alone* does not suffice to prove the objective prong where the decedent, prior to his death, showed no symptoms of a serious medical need." *Id.* (emphasis added). Here, by contrast, Burnette exhibited "external signs of internal distress" which would indicate "to a layperson that a detainee has a serious medical need." *Id.* at 988 (quoting *Grote*, 85 F.4th at 406). Accordingly, to the extent the Whitley County Defendants (and Defendant Claxton) rely on *Hodges*, the Court finds their arguments to be wholly unpersuasive. *See* [R. 121-1, p. 42]; [R. 92-1, p. 12].

### ii. Subjective Prong (Reckless Disregard)

As already explained, the Sixth Circuit has modified the subjective element of the deliberate indifference analysis for pretrial detainees like Burnette. *See supra* Section III(A)(1)(a). In short, the Sixth Circuit "lower[ed] the subjective component from actual knowledge to recklessness." *Helphenstine*, 60 F.4th at 316. Under this "easier-to-meet subjective element,"

28

*Hehrer*, 161 F.4th at 963, the "key question" can be framed as follows: Did the defendant officers "act 'recklessly in the face of an unjustifiably high risk' that is either 'known or so obvious that it should be known?'" *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *2 (6th Cir. Feb. 10, 2022) (quoting *Brawner*, 14 F.4th at 596–97).

The Sixth Circuit has explained "that this test requires more than mere negligence." *Hehrer*, 161 F.4th at 964 (citing *Brawner*, 14 F.4th 596). The Sixth Circuit has elaborated on the difference between negligence and recklessness, turning to common-law principles:

> According to common-law sources, the difference turns on the size of the risk of harm. For recklessness, the risk must be "substantially greater than that which is necessary to make [a defendant's] conduct negligent." Restatement (Second) of Torts § 500 (A.L.I. 1965); *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). That is, the "difference" in the risk must be "so marked as to amount substantially to a difference in kind" rather than degree. Restatement (Second) of Torts § 500 cmt. g. Put differently, it must be "highly probable" that the risk would materialize and cause harm. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984).

*Hehrer*, 161 F.4th at 964.

When such a risk exists, a plaintiff must then show that the defendants "responded unreasonably" to the risk. *Id.* (quoting *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024)). As for corrections officers responding to an inmate's medical needs, the Sixth Circuit has acknowledged that they "lack medical expertise," and as such, "they typically act reasonably by referring an inmate's health concerns to medical personnel." *Id.* (citations omitted). And "once inmates begin to receive care from a medical professional, officers typically act reasonably by following the 'medical professional's diagnosis or treatment.'" *Id.* (quoting *Grote*, 85 F.4th at 412). To be clear, however, the "general principle that it is often sufficient for a jailer to contact a medical professional when they perceive a medical issue" applies "when a jailer contemporaneously contacts a medical professional who can provide *near-immediate* treatment."

*Helphenstine*, 60 F.4th at 318 (emphasis in original). "Indeed," the Sixth Circuit has explained, "as little as a one-hour delay in treatment could be enough for a jury to conclude that a jailer was indifferent to an inmate's medical needs." *Id.* (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 845 (6th Cir. 2002).

In considering this subjective component, the Court must "analyze each defendant individually." *Greene v. Crawford Cnty.*, 22 F.4th 593, 608 (6th Cir. 2022)  Accordingly, for each individual Whitley County Defendant, the Court asks whether that defendant "act[ed] 'recklessly in the face of an unjustifiably high risk' that [was] either 'known or so obvious that it should [have been] known.'" *Britt*, 2022 WL 405847, at *2 (quoting *Brawner*, 14 F.4th at 596–97).

*Joan Caudell*. Joan Caudell first encountered Burnette in the booking area, as he was being processed into the detention facility. [R. 100, p. 27:13–15 (Joan Caudell Depo.)]. She noticed his shaking and believed he might have been cold; however, he advised that he was withdrawing. *Id.* at 27:16–17, 28:4–14. Not long after, jail staff, including Joan Caudell, were advised of a possible seizure in cell 203. *Id.* at 29:10–12. When she arrived at the cell, she could see Burnette "still shaking," and she believed he was withdrawing. *Id.* 29:17–20, 44:1–6. She did not believe he was having a seizure, but that determination was not based on her own observations, but rather because Burnette "said I'm not having a seizure, I'm withdrawing." *Id.* at 40:11–15.  She also saw that he had "sweated through his" jail uniform. *Id.* at 30:12–13. And, if there was any doubt as to whether Joan Caudell believed that Burnette needed medical assistance at this time, she testified that she "offered [Burnette] medical," but Burnette "said he did not wish to see medical." *Id.* at 30:9–10. Because Burnette declined medical, Joan Caudell did not contact any medical personnel. *Id.* at 40:16–19. Instead, she ordered McClure to provide Burnette with a shower and place him in an isolation cell for medical observation. *Id.* at 30:12–13. She did so "[b]ecause he was withdrawing

30

and he was shaking and he was sweating and [she] wanted to keep an eye on him . . . , [a] close eye on him." *Id.* at 30: 18–25. It is undisputed that Joan Caudell did not call an ambulance or reach out to any medical personnel at this time. From this, a reasonable jury could find that Joan Caudell acted recklessly by failing to obtain any medical services for Burnette.

Nevertheless, she testified that she occasionally checked on Burnette through the control room's video footage during the remainder of her shift. [R. 100, pp. 34:9–25, 35:1]. She testified that she did not see any concerning behavior; however, the video footage shows Burnette lying on the bed, fidgeting and shaking throughout the night, unable to be still. [R. 127 (WCDC Video 9) at 8:00–11:25:07]. It is unclear if he slept at all. *See generally id.* And when Joan Caudell would ask McClure about Burnette's condition, he would respond that he was still "breathing, shaking, and sweating." [R. 103, pp. 46:3–7, 47:4–7 (McClure Depo.)]. Still, Joan Caudell did not take any action to notify medical personnel or otherwise obtain medical assistance for Burnette.

Indeed, it was not until approximately 6:30 a.m., shortly before the end of her shift, that Joan Caudell allegedly notified Hounshell and Mullis of Burnette's condition. [R. 100, p. 35:3–19 (Joan Caudell Depo.)]. She testified that she "gave them all of the intake paperwork" and the medical questionnaires, and she let them know that "a male [had] come in who was withdrawing from heroin and meth and he needed to be the first one that they saw." *Id.* at 35:3–10. However, the nurses dispute that this conversation took place. *See* [R. 108, pp. 30:17–25, 31:1–4 (Hounshell Depo.)]. This presents a factual dispute that comes down to a question of credibility. It is not for this Court to weigh the credibility of witnesses at this stage of the proceedings, however. *See Render v. FCA US, LLC*, 53 F.4th 905, 914 (6th Cir. 2022) (explaining that "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited" (quoting *Kirilenko-Ison v. Bd. of Edu. of Danville Indep. Schs.*, 974 F.3d 652 at 660 (6th Cir.

31

2020))) (internal quotation marks omitted).

Regardless, even assuming that a jury believes that Joan Caudell told the nurses that "a male [had] come in who was withdrawing from heroin and meth and he needed to be the first one that they saw," [R. 100, p. 35:3–10], it is undisputed that this conversation took place around 6:30 a.m., over seven hours after Joan Caudell first witnessed Burnette violently shaking and sweating in cell 203 and deemed his condition serious enough to need medical observation, and several hours after she observed him throughout the night and was advised that he continued shaking and sweating. In other words, at the very least, Joan Caudell waited several hours before seeking medical assistance for Burnette, despite recognizing the need for medical observation and observing obvious signs of internal distress from which she knew or should have known that he needed medical care.

These facts are not unlike those in *Helphenstine v. Lewis County*, 60 F.4th 305 (6th Cir. 2023). There, a guard knew that Helphenstine was in withdrawal and that he had vomited and soiled himself, had refused to eat or drink, and had not gotten out of bed for twenty-four hours. *Id.* at 318. The guard took no action to help him beyond faxing an off-duty physician in the early morning hours, despite knowing that the physician's office would not be open for several hours. *Id.* at 318–19. The Sixth Circuit found that "[a] jury could conclude that [the guard's] choice to send a fax in the middle of the night, when no one would be present at [the physician's] office and no one would respond for several hours, was deliberately indifferent to Helphenstine's medical needs." *Id.* at 319.

Similarly, Joan Caudell was advised that Burnette was withdrawing and was aware of obvious signs of internal distress—including shaking, which was so violent that multiple guards believed Burnette was seizing, and profuse sweating—and she even believed that his condition

32

was serious enough to warrant medical observation in an isolation cell. Yet, she did not contact medical personnel or emergency services, or obtain any medical assistance whatsoever, for over seven hours, and instead chose to wait until the nurses arrived for their regular shift.

Based on the current record and viewing the facts in the light most favorable to Plaintiffs, a jury could find that Joan Caudell's decision to wait several hours before communicating with medical staff was deliberately indifferent to Burnette's medical needs. Stated another way, a jury could reasonably conclude that Joan Caudell recklessly failed to act reasonably by not seeking prompt medical assistance for Burnette. *See generally Helphenstine*, 60 F.4th at 319.

*Ryan McClure*. McClure's first interaction with Burnette was at approximately 12:39 a.m. on September 8, 2022, when he responded to Joan Caudell's calls for assistance in cell 203. *See* [R. 127 (WCDC Video 3) at 31:18]. When he entered cell 203, he saw Burnette "clearly showing signs of detoxing," including "shaking and sweating." [R. 103, p. 32:1–6 (McClure Depo.)]. Indeed, as explained, Burnette was shaking so badly that McClure and the other staff members initially "thought [Burnette] was having a seizure." *Id.* at 33:23–25, 34:1–3. As a result, McClure followed "seizure protocols" and placed ammonia under Burnette's nose to "try and break him out of the seizure." *Id.* at 34:3–6; [R. 127 (WCDC Video 3) at 3:19–32:04]. At that point, Burnette spoke and advised that he was withdrawing from heroin and methamphetamine. [R. 100, p. 30:7–9 (Joan Caudell Depo.)]. Soon after, McClure and the other guards exited cell 203, *see* [R. 127 (WCDC Video 3) at 32:57–33:00], and according to McClure, they discussed "what to do" and how they could "prevent him from possibly overdosing." [R. 103, p. 59:4–16 (McClure Depo.)]. However, McClure could not remember if anyone discussed contacting the nurses or calling an ambulance, *see id.* at 59:23–25, 60:1–4, and it is undisputed that the guards did not call the nurses or emergency services at that time. From this, a reasonable jury could find that McClure acted

33

recklessly by failing to obtain any medical services for Burnette.

McClure then helped Burnette to the shower in room 208, after which McClure "noticed [Burnette] was a little unsteady on his feet," [R. 103, p. 35:2], and "was shaking and sweating." *Id.* at 35:14. Burnette also needed McClure's assistance getting dressed "because he was shaking." *Id.* at 25:20–21. Given Burnette's unsteadiness and not wanting Burnette to fall, McClure located a wheelchair and "assisted [Burnette] into sitting in the wheelchair." *Id.* at 35:3–4. Around this time, Joan Caudell ordered McClure to place Burnette in an isolation cell for medical observation. *Id.* at 35:4–10, 37:22–25, 38:1–5; [R. 100, p. 30:15–17 (Joan Caudell Depo.)]. During the transport to isolation cell 183, Burnette was slumped over in his wheelchair and even began falling or sliding out of the chair, requiring McClure's assistance to sit upright. [R. 127 (WCDC Video 4) at 2:45–51]. And McClure observed him having "jerking like reflexes." [R. 103, p. 42:6–13]; *see also* [R. 127 (WCDC Video 9) at 4:40–6:27]. McClure also realized that Burnette's condition had worsened since he was first escorted to the shower. He testified that Burnette was no longer able to speak in full sentences and gave only one-word answers; he was "sweating a lot more"; and he continued "shaking and sweating." [R. 103, p. 41:5–25].

By this point, McClure believed Burnette needed medical attention. *Id.* at 40:24–25, 41:1–3, 42:14–21. He admitted, however, that he did not contact the nurses or emergency services, or otherwise provide any medical assistance to Burnette. *Id.* at 40:1–4. He instead left it up to Joan Caudell to make that call. *Id.* Yet, he could not recall ever contacting Joan Caudell to inform her that Burnette needed medical assistance. *Id.* at 43:2–7. Indeed, throughout the early morning hours, he spoke with Joan Caudell multiple times, advising that Burnette was "about the same as he was when . . . he was in [cell] 203," and he was "breathing, shaking, and sweating." *Id.* at 46:3–7, 47:4–7. At no point during these conversations did McClure suggest to Joan Caudell that the nurses or

34

an ambulance needed to be called. *Id.* at 47:10–13. Instead, he "left it up to" Joan Caudell to decide whether to contact medical personnel. *Id.* at 47:14–21. Yet, throughout the early morning hours, he checked on Burnette multiple times and would have been aware that no medical assistance had been provided. A jury could weigh this evidence and conclude that McClure recklessly failed to act reasonably by not seeking any medical assistance for Burnette.

As to whether McClure eventually told the nurses that Burnette needed to be evaluated, the Court notes that there is conflicting testimony on this point. Huddleston testified that, around 7:00 a.m., he overheard McClure telling the nurses that they needed to see Burnette "first thing" that morning. [R. 101, pp. 31:21–25, 32:1–2,41:8–15 (Huddleston Depo.)]. McClure testified that he could not recall this conversation, but it was "something that [he] potentially could have done." [R. 103, p. 48:19–25, 49:1–6 (McClure Depo.)]. Nevertheless, Hounshell testified that the nurses were not told of any incidents of a medical nature involving Burnette, and they were not even advised that he had been placed in an isolation cell for medical observation. [R. 108, pp. 30:17–25, 31:1–4 (Hounshell Depo.)]. Essentially, then, this factual dispute comes down to a question of credibility. However, as already explained, the Court cannot weigh the credibility of witnesses at this stage of the proceedings. *See Render*, 53 F.4th at 914.

Regardless, even assuming McClure notified the nurses of Burnette's condition and need for medical assistance, that notification came roughly seven hours after McClure first observed Burnette exhibiting obvious external signs of internal distress, including violent shaking, profuse sweating, potential seizures, and unsteadiness, and several hours after he first recognized the seriousness of Burnette's condition and his need for medical assistance. Stated another way, McClure waited several hours before seeking medical assistance for Burnette, despite recognizing the need for medical assistance and observing obvious external signs of internal distress from

35

which he knew or should have known that Burnette needed medical care.

Based on the current record and viewing the facts in the light most favorable to Plaintiffs, a jury could find that McClure's decision to wait several hours before communicating with medical staff was deliberately indifferent to Burnette's medical needs. Stated another way, a jury could reasonably conclude that McClure recklessly failed to act reasonably by not seeking prompt medical assistance for Burnette. *See generally Helphenstine*, 60 F.4th at 319.

*Nick Huddleston*. Huddleston was the guard on duty in the control room during the 11:00 p.m. to 7:00 a.m. shift on September 7, 2022. [R. 101, p. 21:13–20 (Huddleston Depo.)]. He first encountered Burnette when the guards were alerted to a possible seizure in cell 203. *Id.* at 24:8–10]. When he entered the cell, Huddleston observed Burnette on the floor "sweating and jerking like he was having a seizure." *Id.* at 26:14–20. As a result, he approached Burnette intending to perform a sternum rub "[t]o try to bring him out of the seizure." *Id.* at 25:16–21; [R. 127 (WCDC Video 3) at 32:40–45]. He also shouted at Burnette, "hey, talk to me," and Burnette responded that he was detoxing from heroin. [R. 101, pp. 24:11–16, 25:20–21, 27:22–25, 28:1–3]. Soon after, Huddleston helped McClure escort Burnette to the shower, during which time he observed Burnette "walk[ing] just fine." *Id.* at 29:14–16. Based on Huddleston's observations of Burnette in the cell 203, during which time Burnette was "sweating and jerking like he was having a seizure," *id.* at 26:14–20, a jury could find that Burnette was in "'obvious' need of *some* medical attention" but Huddleston's failure to seek even basic medical assistance for Burnette was reckless. *Greene*, 22 F.4th at 608–09 (emphasis in original) (citation omitted); *see also Helphenstine*, 60 F.4th at 317.

Moreover, after escorting Burnett to the shower, Huddleston then returned to the control room and had access to the video footage of isolation cell 183, where Burnette was placed after

36

his shower. [R. 101, pp. 29:2–4]. During the time that Huddleston was in the control room, the video footage from cell 203 showed Burnette being taken into isolation cell 183 in a wheelchair, slumping and struggling to sit upright in the wheelchair, shaking and fidgeting, and being unable to sit or lie still. *See* [R. 127 (WCDC Video 9)] Again, it is unclear if Burnette slept at all over the next several hours. *Id.* Nevertheless, while Huddleston did not deny having access to and monitoring this footage while in the control room, he testified that he could not recall anything about Burnette after he was placed in the isolation cell. *Id.* at 37:14–16. A reasonable jury could weigh the evidence and the credibility of the witnesses, including Huddleston, and determine that Huddleston, with full and actual knowledge of Burnette's condition in cell 203, observed him in the medical isolation cell and should have known that Burnette needed medical assistance. As such, a jury could conclude that Huddleston's failure to contact medical assistance during this time period was also reckless.

*Steve Claxton*. Claxton began his shift in the isolation ward at around 7:00 a.m. on September 8, 2022. [R. 105, p. 70:10–13 (Claxton Depo.)]. As part of his duties, Claxton testified that, every fifteen minutes, he would raise the flap on the cell door, "holler at [Burnette]" and "kind of kick the door to get his attention," and "a lot of times he would wake up, he'd raise up and look." *Id.* at 74:2–6. Claxton testified that he observed Burnette "sweating a lot," but he did not observe any problems with Burnette's breathing. *Id.* at 92:15–21. Later that day, Claxton escorted Burnette from isolation cell 183 to the hallway outside the video arraignment room. As the Court has already explained in detail, the video footage from this time period shows Claxton grabbing Burnette's sleeve and pulling him to a standing position, then leading him out of the isolation cell with one hand grabbing the back of Burnette's shirt. [R. 127 (WCDC Video 8) at 11:48–53, 11:53–12:04]. And throughout their time in the hallway, Claxton had at least one hand on Burnete's arm

37

or grasping the back of his shirt, and several times, Claxton placed both hands on Burnette's back. *See* [R. 127 (WCDC Video 6) at 7:00–10:08]. During this time, Burnette can be seen leaning his head against the wall and moving his head back and forth. *See id.* at 7:00–10:08.

But there is a material dispute of fact as to *why* Claxton physically detained Burnette in this way. Claxton testified that he treated all isolation inmates in this manner, and he was instructed that all inmates should face the wall. [R. 105, pp. 85:1–2, 87:21–23, 88:2–11, 89:3–22 (Claxton Depo.)]. However, the video clearly shows that Burnette was the only inmate being treated in such a manner. *See generally* [R. 127 (WCDC Video 6)]. And Hounshell testified that she saw Claxton "holding [Burnette] up." [R. 108, pp. 36:23–25, 37:1–4 (Hounshell Depo.)]. Thus, the jury could weigh the evidence and the credibility of the witnesses and reasonably determine that Claxton was physically "holding [Burnette] up." *Id.*

Regardless, after watching Burnette's interaction with the judge and in the hallway, Claxton had concerns about Burnette's health and wellbeing. [R. 105, p. 96:2–8 (Claxton Depo.)]. He developed these concerns because Burnette "was sweating real bad" and due to "[t]he way he was breathing there in the video arraignment." *Id.* at 96:9–16. Nevertheless, there is a dispute of fact as to whether he took any actions to obtain medical assistance for Burnette. According to Claxton, as he escorted Burnette back down the hallway towards isolation cell 183, he and Jimmy Caudell discussed Burnette's condition, and Claxton advised that he would let Henry know. *Id.* at 98:1–15. However, Henry testified that he was not told of any issues with Burnette until he heard the medical emergency call over the radio at approximately 2:00 p.m. that day. [R. 102, pp. 26:23–25, 27:1–3 (Henry Depo.)].

Moreover, even after he allegedly told Henry that Burnette needed medical assistance, Claxton continued to monitor and observe Burnette in the isolation cell, from approximately 1:20

38

p.m. through 1:55 p.m. Video footage shows that, during this time period, Burnette moved from sitting in a stool, to sitting on the floor, to lying on the floor, vomited at least once, and was shaking and fidgeting, before he eventually became motionless on the floor. *See* [R. 127 (WCDC Video 8) at 29:30–54:20]. And during this period, Claxton allegedly checked on Burnette every fifteen minutes, *see* [R. 105, pp. 100:19–25, 101:3 (Claxton Depo.)], with his last "check" occurring at approximately 1:55 p.m. *See* [R. 126-19 (Claxton Incident Report)]. This means that Claxton, per his own testimony, checked on Burnette around 1:40 p.m., at which time Burnette was lying on the floor, shaking and fidgeting, and he had already vomited on the floor. Thus, even assuming Claxton told Henry about Burnette's condition immediately after the video arraignment, a jury could review the evidence and conclude that Claxton was aware of Burnette's worsening condition, and that he acted recklessly by failing to obtain medical assistance. *See generally Hehrer*, 161 F.4th at 964 ("An officer might act recklessly . . . if the officer does not seek medical help after an inmate suffers from 'new and alarming symptoms' since last seeing a medical professional." (citations omitted)).

The Court makes one final point as to Defendant Claxton. Claxton repeatedly emphasizes that officers are entitled to rely on the opinions of medical personnel. *See, e.g.*, [R. 92-1, p. 14]. He fails to make any argument or point to any evidence that he relied on any medical professional's opinion, however. To the extent he refers to Hounshell and Mullis's presence in the hallway prior to Burnette's video arraignment, the record is clear that the nurses did not conduct any type of screening or medical assessment of Burnette, nor did they provide any opinion on his condition. Accordingly, while "officers typically act reasonably by following [a] 'medical professional's diagnosis or treatment,'" *Hehrer*, 161 F.4th at 964 (quoting *Grote*, 85 F.4th at 412), that general

rule is inapplicable to the facts at hand.[12]

*Jimmy Caudell*. Jimmy Caudell's interaction with Burnette was brief, lasting less than ten minutes. At around 1:11 p.m. on September 8, 2022, Claxton retrieved Burnette from isolation cell 183, while Jimmy Caudell stood nearby, either in the hallway or in or near the doorway to the cell. [R. 104, pp. 36:21–25, 37:1–1 (Jimmy Caudell Depo.)]. Jimmy Caudell testified that Burnette was "sweating profusely" and he was "kind of shaky," or "pretty shaky and kind of moving around a little bit, his body." *Id.* at 34:24–25, 35:1–4, 37:5–13. He and Claxton asked Burnette "what was wrong with him," and Burnette told them "he was detoxing from heroin and meth" and "he would be okay." *Id.* at 36:12–16; 39:1–4. Jimmy Caudell also testified that Burnette walked on "his own willpower." *Id.* at 37:13.

Claxton and Jimmy Caudell escorted Burnette to the hallway where several other inmates were lined up waiting for their video court appearances. *See* [R. 127 (WCDC Video 6) at 6:55–7:00]. Around this time, Mullis testified that she asked Jimmy Caudell if Burnette needed to be seen, and he told the nurses that Burnette was going to his arraignment. [R. 107, pp. 31:21–25, 32:1–8 (Mullis Depo.)]. However, Jimmy Caudell testified that he did not see any of the nurses near the video arraignment room. [R. 104, p. 44:6–8 (Jimmy Caudell Depo.)]. Around 1:18 p.m., Claxton assisted Burnette into the room for his video court appearance; Jimmy Caudell was also in the room, standing to Burnette's left. *See* [R. 127 (WCDC Video 6) at 10:13]; [R. 127 (WCDC Video 10) at 00:06–12]; [R. 104, pp. 40:12–13 (Jimmy Caudell Depo.)]. When the judge question

---

[12] The Whitley County Defendants also repeatedly emphasize the general rule that officers are entitled to rely on the opinions of medical personnel. *See* [R. 121-1, pp. 42–43]. Like Claxton, they also fail to make any argument or point to any evidence that they relied on any medical professional's opinion, however. To the extent that they are also referring to Hounshell and Mullis's presence in the hallway prior to Burnette's video arraignment, the Court again notes that the nurses did not conduct any type of screening or medical assessment of Burnette, nor did they provide any opinion on his condition. Regardless, the Court will grant summary judgment for the other individual Whitley County Defendants that were present in the hallway, as to the § 1983 deliberate indifference claims against them in their individual capacities, for other reasons, as explained herein.

"what's going on" with Burnette, Jimmy Caudell responded that Burnette was in withdrawal. *See* [R. 127 (WCDC Video 10), at 00:24–31]; [R. 104, p. 41:9–23, 75:4–8 (Jimmy Caudell Depo.)]; [R. 105, p. 94:9–11 (Claxton Depo.)]. Claxton testified that, after the video arraignment, he and Jimmy Caudell discussed Burnette's condition. [R. 105, p. 98:1–15]. Specifically, Jimmy Caudell mentioned that Burnette was "sweating a lot," but he did not mention that Burnette needed medical assistance. *Id.* Claxton advised Jimmy Caudell that he would let Henry know. *Id.*

On this record, Jimmy Caudell's interactions with Burnette are similar to one guard's experiences in *Helphenstine*. In that case, the guard "merely walked Helphenstine from the jail to the courthouse. . . ; informed the judge that Helphenstine was 'acting like he's just clear out of it,' had '[s]tuff coming out of his mouth,' and was 'really not coherent'; and walked Helphenstine back to the jail." *Helphenstine*, 60 F.4th at 321. He had not observed Helphenstine vomiting, having diarrhea, shaking, sweating, or any other manifestation of illness, and had no "reason to appreciate the seriousness of [Helphenstine's] condition." *Id.* And while the guard knew that Helphenstine was "going through withdrawal, that knowledge alone did not require [him] to seek medical care for Helphenstine, particularly since withdrawal 'typically may be managed in a prison setting and indeed frequently is managed there.'" *Id.* (quoting *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006)).

Similarly, Jimmy Caudell merely accompanied Claxton as he took Burnette to his video court appearance, and, at most, he observed Burnette sweating and being physically assisted by Claxton, and he observed him during his court appearance, when he sat mouth agape and did not speak. He had not observed Burnette at any time prior to him being removed from isolation cell 183, and there is no evidence suggesting that he was aware of Burnette's condition in the hours leading up to his court appearance. And while Burnette advised Jimmy Caudell that he was

41

"detoxing," or in withdrawal, "that knowledge *alone* did not require [him] to seek medical care for [Burnette], particularly since withdrawal 'typically may be managed in a prison setting and indeed frequently is managed there.'" *Id.* (quoting *Speers*, 196 F. App'x at 396) (emphasis added). As such, based on the current record and viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could not find the subjective component satisfied as to Defendant Jimmy Caudell.

*Zane Turner*. Turner's interaction with Burnette was also brief. He was working as the assistant court coordinator on September 8, 2022, and in this capacity, he would make sure that inmates attended their video court appearances. [R. 106, pp. 34:2, 35:23–25, 36:1–2 (Turner Depo.)]. He was in the hallway when Burnette was escorted by Claxton and placed in line for his video court appearance. *Id.* at 31:8–10. He did not recall having any specific conversations about Burnette with the other guards. *Id.* at 35:7–12. He did not recall having any concerns about Burnette's condition while in the hallway, and he was not concerned that Claxton was physically holding Burnette. *Id.* at 37:1–3, 25, 38:1–2. Turner stood in the doorway of the video arraignment room during Burnette's video court appearance. [R. 106, p. 40:9–13 (Turner Depo.)]. He could not recall if he was able to hear the judge's statements, although he testified that he could "sometimes" hear the judge speak during video court appearances. *Id.* at 46:4–15. He could not recall Caudell advising the judge that Burnette was going through withdrawals. *Id.* at 46:25, 47:1–3.

While Turner purports to remember very few, if any, details from this interaction, the Court notes that a jury could review the available video footage and find that, at the very least, Turner observed Burnette being physically assisted by Claxton both in the hallway and the video arraignment room, and could have overheard the arraignment. However, even assuming that Turner made such observations, there is no evidence suggesting that he had any reason to know that Burnette was suffering from a serious medical need.

42

In this way, Turner's interactions with Burnette are also similar to the guard's experiences in *Helphenstine*, where the guard "merely walked Helphenstine from the jail to the courthouse" and had no "reason to appreciate the seriousness of [Helphenstine's] condition." *Helphenstine*, 60 F.4th at 321. Moreover, here, it is not clear that Turner even knew Burnette was experiencing withdrawal or was under medical observation, and he had not previously observed Burnette experiencing any symptoms of withdrawal, nor did he have any knowledge of such symptoms. At most, he observed Turner being physically assisted in the hallway and he was present in or near the room when Burnette appeared for his video arraignment. But even assuming that Turner observed Burnette being physically assisted in the hallway and observed him in the video arraignment room, and even assuming he had been told that Burnette was in withdrawal, Turner had no prior interactions with Burnette and would have seen no other symptoms that might have given him "reason to appreciate the seriousness of [Burnette's] condition." *Id.* As such, based on the current record and viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could not find the subjective component satisfied as to Defendant Turner.

*Brian Lawson*. Lawson, who served as the jailer during the relevant time period, first encountered Burnette in the hallway as he waited for his video court appearance. *See* [R. 98, pp. 59:25, 60:1–12, 4–16 (Lawson Depo.)]. Prior to that, he had been informed that two inmates, including Burnette, were "acting out of the normal a little bit," so he went to the hallway to check on those inmates. *Id.* He was also in or near the room during Burnette's video arraignment. *Id.* at 63:3–6, 16–19. Having observed Burnette, Lawson concluded that "something wasn't right" and "wasn't normal." *Id.* at 62:18–21, 65:1–3. He could not determine whether Burnette "was high [or] whether he was going through withdrawals." *Id.* at 65:3–5. While he did not think it was "a medical emergency where 911 needed to be called," *id.* at 65:3–10, he did think it appropriate to notify the

nurses, Hounshell and Mullis, that Burnette needed to be seen. *Id.* at 65:3–5. At approximately 1:32 p.m., Lawson notified Hounshell that "there were two inmates back there not acting right, you all need to check them out or could you check them out." *Id.* at 84:10–14. Neither Mullis nor Hounshell deny that this conversation took place. Mullis, for her part, was nearby in the breakroom but could not overhear the conversation between Lawson and Hounshell. [R. 107, p. 35:1–2 (Mullis Depo.)]. Hounshell acknowledged that Lawson told her that Burnette needed to be seen. *See, e.g.*, [R. 108, p. 50:8–15 (Hounshell Depo.)].

Plaintiffs argue that Lawson "personally witnessed Burnette's serious medical condition at the video arraignment and did nothing to help." [R. 126, p. 38]. The record is clear, however, that much like Jimmy Caudell and Taylor, Lawson had no reason to know of the seriousness of Burnette's condition at that time. Plaintiffs do not argue, and the evidence does not suggest, that Lawson was aware of the events in cell 203 or that Burnette claimed to be in withdrawal, or that Lawson was otherwise aware of any of Burnette's symptoms, beyond what he briefly observed in the hallway. And while Lawson may have suspected that Burnette was in withdrawal (or was under the influence), the Court has already explained that "that knowledge *alone* did not require [him] to seek medical care for [Burnette], particularly since withdrawal 'typically may be managed in a prison setting and indeed frequently is managed there.'" *Helphenstine*, 60 F.4th at 321 (quoting *Speers*, 196 F. App'x at 396) (emphasis added). Nevertheless, within twelve minutes of Burnette's video arraignment, Lawson did reach out to Hounshell and advised her that Burnette needed to be seen. Under these facts, a reasonable jury could not find that Lawson acted recklessly.

And, importantly, beyond arguing that Lawson "did nothing to help" Burnette, Plaintiffs point to no other evidence suggesting that Lawson was deliberately indifferent for failing to seek medical care for Burnette or that he otherwise responded inappropriately to Burnette's condition.

44

*See* [R. 126, pp. 37–38]. Instead, when discussing the subjective component of their § 1983 claim, Plaintiffs' primary argument is that Lawson, as jailer, failed to adequately train his employees on how to respond to medical emergencies. *Id.* The Court understands that this argument goes to Plaintiffs' claim of supervisory liability against Lawson, which the Court addresses below. *See infra* Section III(F).

*Roger Henry*. During the relevant time frame, Henry was a corporal at the detention center. [R. 102, p. 20:22–24]. In this role, his responsibilities were "the same as any other officer," but he was in a position to "advise in situations." *Id.* at 21:6–11. Neither party points to any interaction between Henry and Burnette, or any observations that Henry made of Burnette. Instead, the plaintiffs point to alleged interactions between Henry and Joan Caudell and Claxton. *See* [R. 126, p. 29]. Both Joan Caudell and Claxton testified that they advised Henry of their concerns about Burnette and his need for medical assistance. Specifically, Joan Caudell testified that, prior to clocking out at 7:00 a.m. on September 8, 2022, told Henry "to make sure cell 183 got seen because they were only in there for medical observation for withdrawals." [R. 100, p. 36:2–15 (Joan Caudell Depo.)]. And, as noted above, Claxton testified that, after escorting Burnette back to his isolation cell after his video court appearance, he went to Henry's office to tell him that Burnette "probably needed to see medical." [R. 105, pp. 96:19–25, 97:1–10 (Claxton Depo.)]. However, Henry testified that he was not alerted to any issues with Burnette until "the medical emergency call came out across the radio" around 2:00 p.m. on September 8, 2022. [R. 102, pp. 26:23–25, 27:1–3 (Henry Depo.)].

The Court finds that, based on the record before it, there is a genuine dispute of material fact as to whether Henry was notified of Burnette's condition and failed to contact medical personnel or otherwise obtain medical assistance for Burnette. On one hand, a jury could weigh

45

the evidence and the credibility of these witnesses and conclude that Henry was never contacted about Burnette and otherwise had no knowledge of Burnette's condition. On the other hand, a jury could weigh the evidence and the credibility of these witnesses and conclude that Henry was aware of Burnette's condition and the need for medical assistance, and he acted recklessly by failing to seek medical assistance for Burnette.

Essentially, then, this factual dispute comes down to a question of credibility. As already explained, it is not for this Court to weigh the credibility of witnesses at this stage of the proceedings, however. *See Render*, 53 F.4th at 914. As such, the Court finds that, as to Defendant Henry, there is a genuine dispute of material fact regarding the subjective component.

In sum, the Court finds that, viewing the record in the light most favorable to the plaintiffs, a jury could find that Joan Caudell, McClure, Huddleston, Claxton, and Henry "recklessly failed to act with reasonable care" in "failing to render or seek any basic medical assistance for [Burnette]" while he suffered from an obvious serious medical need. The Court will therefore deny their motions to the extent they seek summary judgment on the § 1983 claim against them in their individual capacities on this ground. However, because a jury could not find that the subjective component is satisfied as to Jimmy Caudell, Turner, and Lawson, the Court will grant summary judgment on the § 1983 claim against those defendants in their individual capacities.

### b. Clearly Established Right

Because the evidence in the record is sufficient to establish a constitutional violation as to Defendants Joan Caudell, McClure, Huddleston, Claxton, and Roger Henry, or at least create a genuine dispute of material fact on that issue, the Court must next turn to the second prong of the qualified immunity test and determine whether the particular constitutional right alleged—here, the right to adequate medical care—was clearly established at the time of its violation. *See Estate*

46

*of Owensby*, 414 F.3d at 602. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Helphenstine*, 60 F.4th at 326 (quoting *Burwell v. City of Lansing*, 7 F.4th 456, 476 (6th Cir. 2021)) (internal quotation marks omitted). However, while "[t]he unlawfulness must be apparent in the light of pre-existing law," the Court "need not find a case in which the very action in question has previously been held unlawful." *Id.* (quoting *Burwell*, 7 F.4th at 476–77) (internal quotation marks omitted).

> As the Sixth Circuit recently explained,
>
> It has been true since 1972 that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." [*Greene v. Crawford Cnty.*, 22 F.4th 593, 615 (6th Cir. 2022) (citation omitted)]; *see also Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972). "Furthermore, we reiterated in 2013 that it is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or an officer." *Greene*, 22 F.4th at 615 (brackets, ellipses, and citation omitted). For example, over a decade ago, we "denied qualified immunity to an officer who failed to seek medical assistance for an individual suffering from [severe alcohol withdrawal] in a situation of obvious illness even when the officer knew that the detainee was on withdrawal medication and being observed." *Id.* (citing *Smith*, 505 F. App'x at 535).

*Helphenstine*, 60 F.4th at 327.

Here, Burnett experienced a dangerous medical condition for over twelve hours before he was seen by a medical professional and ultimately transported to a hospital. The individual Whitley County Defendants, namely, Joan Caudell and McClure, did not provide any medical assistance beyond allegedly notifying Hounshell and Mullis, several hours after Burnette began showing symptoms of a serious medical condition. And while Claxton allegedly notified Henry, he certainly made no efforts to obtain medical assistance for Burnette as his symptoms worsened. Some of the individual Whitley County Defendants, including Huddleston and possibly Henry, did not even notify medical personnel or a supervisor. Burnette's "right not to have his serious medical needs

47

disregarded by the [Whitley County Defendants] was clearly established in this scenario." *Id.* at 327.

In sum, the Court finds that, viewing the facts in the light most favorable to Plaintiffs, a jury could find that Joan Caudell, McClure, Huddleston, Claxton, and Henry were deliberately indifferent to Burnette's serious medical needs, and his right not to have his serious medical needs disregarded was clearly established at the time of those alleged constitutional violations. Accordingly, these remaining individual Whitley County Defendants are not entitled to qualified immunity. The Court will therefore deny their motion to the extent they seek summary judgment on the § 1983 claim, asserted against them in their individual capacities.

### B. Plaintiffs' § 1983 Claims Against Defendant Claxton and the Individual Whitley County Defendants, in Their Official Capacities

As noted above, Plaintiffs bring their § 1983 deliberate indifference claim against the individual Whitley County defendants in both their individual and official capacities. The individual capacity claims are addressed above. *See supra* Section III(A). However, state officials sued in their official capacities for damages are immune from § 1983 liability under the Eleventh Amendment. *Barton v. Whitley Cnty.*, No. 6:24-CV-145-CHB, 2025 WL 1646258, at *3 (E.D. Ky. June 10, 2025) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)). "Moreover, when state officials are sued in their official capacities for monetary damages, they are not 'persons' subject to suit within the meaning of § 1983." *Id.* (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). And to the extent Plaintiffs attempt to assert a claim against the officers in their official capacities under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), those claims duplicate the one against Whitley County, which is discussed in more detail below. *See infra* Section III(D); *Graham*, 473 U.S. at 165–66 (explaining that the real party in interest is the governmental entity); *Hehrer*, 161 F.4th at 967. Therefore, the Court will dismiss

the § 1983 claim against the individual Whitley County Defendants—that, is Lawson, Huddleston, McClure, Henry, Joan Caudell, Jimmy Caudell, and Turner—to the extent they are sued in their official capacities.

### C.  Plaintiffs' § 1983 Claim Against the Individual SHP Defendants

Plaintiffs also bring their § 1983 deliberate indifference claim against Defendants Mullis and Tami Hounshell, the individual SHP Defendants. As already explained, to prevail on this claim, Plaintiffs must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *North*, 754 F. App'x at 384 (quoting *Shadrick*, 805 F.3d at 736) (internal quotation marks omitted). In the present case, only the first element—a constitutional violation—is contested by the SHP Defendants.[13] *See* [R. 97]; *Green v. Tennessee*, No. 20-6396, 2021 WL 6197327, at *1 (6th Cir. Sept. 8, 2021) ("Private companies, and their employees, that perform traditional state functions, such as providing medical care to inmates, are state actors for the purposes of § 1983." (quoting *Martin v. Warren Cnty.*, 799 F. App'x 329, 337 (6th Cir. 2020) (cleaned up)).

As with the individual Whitley County Defendants, the plaintiffs allege that the individual SHP Defendants, Mullis and Hounshell, were deliberately indifferent to Burnette's serious medical needs in violation of his Fourteenth Amendment rights. [R. 46, ¶¶ 75–82]. As already explained, to prevail on such a claim, Plaintiffs must demonstrate that (1) Burnette had a sufficiently serious medical need and (2) Mullis and Hounshell's actions (or lack of action) were intentional (i.e., not accidental), and each either intentionally ignored Burnette's serious medical need, or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Burnette], even

---

[13] Moreover, the SHP Defendants do not assert a qualified immunity defense, nor could they. *See Penman v. Correct Care Solutions*, No. 5:18-cv-00058-TBR-LLK, 2021 WL 3134255, at *2 (W.D. Ky. July 23, 2021) ("The Sixth Circuit concurs with the Fifth, Seventh, Ninth, and Eleventh Circuits that employees of corporations in the business of administering correctional health care services are not entitled to assert qualified immunity." (citations omitted)).

49

though a reasonable [person] in [that defendant's] position would have known that the serious medical need posed an excessive risk to [Burnette's] health or safety." *Brawner*, 14 F.4th at 597. The Court has already addressed the objective prong and has determined that Burnette had a sufficiently serious medical need. *See supra* Section III(A)(1)(a)(i). The Court therefore turns to the subjective prong.

As for this prong, the SHP Defendants argue that they were "unaware of any medical problems with Mr. Burnette that morning and planned on performing his medical intake after his video arraignment," and further, "[t]here was no sense of urgency conveyed to the medical staff at any time until [Burnette] was found unresponsive in his cell." [R. 97-1, p. 7].[14] However, on the record before the Court, there is clearly a genuine dispute of material fact as to what Hounshell and Mullis knew about Burnette's condition, and when they knew it. Hounshell testified that, when they arrived for their shift on September 8, 2022, Burnette had not been placed on the sick call list, the nurses were not told of any incidents of a medical nature involving Burnette, and they were not told that he had been transferred to an isolation cell for medical observation. [R. 108, pp. 30:17–25, 31:1–4 (Hounshell Depo.)]. She further testified that they reviewed his medical questionnaire and flagged his answer to the question regarding delirium tremens, but they did not have any further information. *Id* at 20:8–20. However, Joan Caudell testified that she spoke with the nurses when they arrived for their shift, around 6:30 a.m., and she specifically advised them that "a male [had] come in who was withdrawing from heroin and meth and he needed to be the first one that they saw." [R. 100, p. 35:3–10 (Joan Caudell Depo.)]. Huddleston also testified that

---

[14] Strangely, Defendant Claxton includes a section in his own motion arguing that the medical staff's actions or inactions amount to, at most, medical negligence, and they do not rise to a constitutional violation. [R. 92-1, pp. 17–18]; *see also* [R. 129, p. 11]. It is unclear to the Court why Defendant Claxton makes this argument on behalf of the nurses, or how this argument relates to Mr. Claxton's own defenses. Regardless, for the reasons explained herein, there are genuine disputes of material fact that prevent summary judgment on the § 1983 claim against the nurses.

he overheard McClure talking to Mullis around 7:00 a.m., shortly after the nurses arrived for their shift, and McClure told Mullis "that she probably needed to check on him this morning—that morning, first thing." [R. 101, p. 41:8–15 (Huddleston Depo.)]. McClure testified that he could not recall this conversation, but that it was "something that [he] potentially could have done." [R. 103, pp. 48:19–25, 49:1–6 (McClure Depo.)]. As to whether the nurses attempted to examine Burnette, but were prevented from doing so, those facts are also in dispute. *See* [R. 107, pp. 46:3–5, 46:23–25, 47:1 (Mullis Depo.)]; [R. 108, pp. 34:14–18, 35:7–8, 36:1–11, 38:12–20 (Hounshell Depo.)]; [R. 99, pp. 52:22–25, 53:1–25, 54:1–8 (King Depo.)].

In a similar case, *Estate of Askew v. Trumbell County*, 4:21-cv-02133, 2025 WL 2897222 (N.D. Ohio Oct. 10, 2025), the record was also "less than clear" as to what notice a nurse had received about a detainee's medical condition. *See id.* at *10. The nurse "was on-call 24/7" to answer questions, but she testified that she never received a call from the jail regarding the detainee, "or at least did not remember receiving any such communication." *Id.* But another defendant, a medical assistant on site at the jail, testified that she had contacted the nurse about the detainee's complaints. *Id.* Reviewing this evidence, the district court concluded that "the nature and extent of [the nurse's] involvement and what she was aware of appears to hinge in large part on credibility determinations, a job reserved for the jury." *Id.* (citation omitted). And "[d]epending on its assessment of the evidence before it, a reasonable jury could conclude that [the nurse] was aware of [the detainee's] situation but 'did nothing.'" *Id.* (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 725 (6th Cir. 2018)). As a result, the district court denied the nurse's motion for summary judgment.

So too here. A jury could weigh the evidence and judge the credibility of the witness and conclude that Joan Caudell notified Mullis and Hounshell of Burnette's conditions as early as 6:30

51

a.m., specifically warned them of his withdrawal, and even urged them to evaluate him first that day. A jury could find that, based on those facts, the nurses were deliberately indifferent to Burnette's medical needs by failing to promptly examine Burnette. Likewise, a jury might conclude that McClure told Mullis around 7:00 a.m. that she needed to check on Burnette "first thing" that morning, and her failure to do so constitutes deliberate indifference. Moreover, if the jury believes the testimony of Joan Caudell and McClure and finds that the nurses were well-aware of the seriousness of Burnette's condition, they could find that the nurses' decision to go on a lunch and smoke break after observing Burnette in the hallway or their decision not to insist on seeing Burnette prior to his court appearance (despite allegedly being told they could not do so) constitutes deliberate indifference. Or a jury could believe that Hounshell and Mullis had *not* been notified of Burnette's condition, and instead, they knew, at most, that he had a history of delirium tremens, but did not know that he was then suffering from withdrawal or was exhibiting any alarming symptoms. From those facts, a jury could find that Hounshell and Mullis were *not* deliberately indifferent to Burnette's medical needs. As such, given this genuine dispute of material facts, the Court will deny the SHP Defendants' motion to the extent they seek summary judgment on the § 1983 claim against Hounshell and Mullis.

### D.  Plaintiffs' § 1983 Claim Against Defendant Whitley County

Plaintiffs also seek to impose municipal liability on Whitley County. [R. 46, ¶ 79]. As the Sixth Circuit has explained, "[a] municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Helphenstine*, 60 F.4th at 323 (quoting *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018)) (internal citations omitted); *see also Monell*, 436 U.S. at 690. However, "[a] municipality cannot be liable under a theory of respondeat superior; it can only be held liable for 'its own wrongdoing.'" *Helphenstine*, 60 F.4th

52

at 323 (quoting *Morgan*, 903 F.3d at 565); *see also Monell*, 436 U.S. at 690; *Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022). Thus, to succeed on a municipal liability theory, a plaintiff must "demonstrate that the alleged federal violation occurred because of a municipal 'policy or custom.'" *Helphenstine*, 60 F.4th at 323 (quoting *Monell*, 436 U.S. at 694). To achieve this, the plaintiff can rely on one of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (quoting *Burgess v. Fischer*, 737 F.3d 462, 478 (6th Cir. 2013) (internal quotation marks omitted).

As an initial matter, the Court notes that Plaintiffs' briefing on this claim is not a model of clarity, and as a result, the Court is left guessing as to exactly what theory or theories Plaintiffs rely on. For instance, Plaintiffs assert that "[t]hrough Lawsons [sic] inaction, he cultivated a culture of indifference to the training of his deputies and their response to the inmates' medical needs." [R. 126, p. 37].[15] Allegations of such inaction, if properly supported, can be used to support the first theory listed above: "the existence of an illegal official policy or legislative enactment." *See Franklin v. Franklin Cnty.*, 115 F.4th 461, 472 (6th Cir. 2024). However, to succeed on such a claim,

> a plaintiff must show "(1) the existence of a clear and persistent pattern of" unconstitutional conduct; (2) "notice or constructive notice" on the part of the municipality; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) "that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation."

---

[15] To add to the confusion, Plaintiffs make this statement in a section devoted to addressing Lawson's alleged liability, not the county's. [R. 126, p. 38]. As explained below, to the extent they are seeking to impose supervisory liability against Lawson in his individual capacity, that claim fails, *see infra* Section III(F), and as explained above, to the extent they seek to impose liability against him in his official capacity, the real party in interest is the county. *See supra* Section III(B). Accordingly, the Court briefly considers this statement in the context of Plaintiffs' municipal liability claim.

53

*Id.* (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). However, this theory is not apparent on the face of the First Amended Complaint, *see* [R. 46], and the Whitley County Defendants understandably did not address this claim or standard in their motion. [R. 121, pp. 48–49]. And, beyond the single sentence quoted above, Plaintiffs make no effort to further develop their "inaction" theory, nor do they cite to the applicable standard. *See* [R. 126, p. 37]. Thus, while the defendants make some attempt to address the standard in their reply brief, [R. 133, p. 11], the Court finds that the parties' arguments on this theory are wholly undeveloped, and it will not consider it further. *See, e.g.*, *Members Heritage Credit Union v. New York Marine & General Ins. Co.*, No. 5:21-CV-207-CHB, 2023 WL 4876383, at *13 (E.D. Ky. July 31, 2023) (explaining that the plaintiff's argument was "wholly undeveloped and the Court need not consider it" (citations omitted)).

From the best the Court can tell, Plaintiffs also rely on the third recognized theory of municipal liability, i.e., that the county failed to train and supervise its jailers regarding medical emergencies. *See, e.g.*, [R. 126, pp. 38–40]. However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous" under such a failure to train theory. *Helphenstine*, 60 F.4th at 323 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Indeed, to ensure that "failure-to-train or failure-to-supervise claims do not transform § 1983 into a vicarious-liability statute, the Supreme Court has required plaintiffs to prove two demanding elements." *Gambrel*, 25 F.4th at 408 (citation omitted). First, the plaintiff must demonstrate that the municipality "acted with 'deliberate indifference' to the fact that its inadequate training or supervision would lead to its agents to violate constitutional rights." *Id.* (citation omitted). Second, the plaintiff must show that "a municipality's improper training or supervision must have 'actually caused' the plaintiff's injury." *Id.* (quoting *Connick*, 563 U.S. at 70).

54

Turning to the first element, deliberate indifference, the Sixth Circuit has explained that, "[u]nder this 'stringent standard of fault,' county officials must have 'disregarded a known or obvious consequence of' their failure to train." *Hehrer*, 161 F.4th at 967 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). Thus, to satisfy this element, "a plaintiff must prove that the violation of a clearly established right was a 'known or obvious consequence' of the lack of training or supervision." *Gambrel*, 25 F.4th at 408 (quoting *Connick*, 563 U.S. at 61). A plaintiff typically satisfies this standard by proving that "a municipality's employees engaged in a 'pattern of similar constitutional violations' separate from the conduct that harmed the plaintiff." *Id.* (quoting *Connick*, 563 U.S. at 62). However, "[i]n a 'narrow range of circumstances,' . . . the Supreme Court has left open the possibility that a plaintiff might prove deliberate indifference using only the single instance of unconstitutional conduct against the plaintiff." *Id.* (quoting *Connick*, 563 U.S. at 63). The Supreme Court reasoned that, "[i]f the need for a certain type of training is sufficiently 'obvious,' . . . the failure to provide the obviously needed training 'could properly be characterized as deliberate indifference to constitutional rights." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)) (cleaned up).

To summarize, Plaintiffs can satisfy the deliberate indifference element of a failure-to-train or failure-to-supervise municipal liability claim by showing either "(1) a 'pattern of similar constitutional violations by untrained employees' or (2) 'a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situation presenting an obvious potential for a constitutional violation.'" *Helphenstine*, 60 F.4th at 323 (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015)).

As for the second element of a failure-to-train or failure-to-supervise municipal liability claim, "a municipality's improper training or supervision must have 'actually caused' the

55

plaintiff's injury." *Gambrel*, 25 F.4th at 408 (quoting *Connick*, 563 U.S. at 70). This element, in turn, "requires proof of the two types of causation from the common law of torts: but-for (or factual) causation and proximate causation." *Id.* (citation omitted).

In the present case, the parties' discussion of the standard for a failure-to-train or failure-to-supervise municipal liability claim is incomplete, at best. *See* [R. 121-1, pp. 48–49]; [R. 126, pp. 25–27, 38–39]. Their application of that standard to the facts of the case and the evidence of record is even less developed. For example, the Whitley County Defendants spend no more than three sentences on this argument in their motion, citing no evidence of record or analogous case law. [R. 121-1, p. 49]. Plaintiffs' response brief adds little to the discussion. [R. 126, pp. 39–40]. Indeed, it is not even clear if the plaintiffs rely on a "pattern of similar constitutional violations by untrained employees," "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situation presenting an obvious potential for a constitutional violation," or both. *See Helphenstine*, 60 F.4th at 323 (quoting *Shadrick*, 805 F.3d at 738–39) (internal quotation marks omitted); *see also* [R. 126, pp. 25–27]. And while the Whitley County Defendants attempt to address this claim with more fervor in their reply brief, [R. 133, pp. 2–11], it is not appropriate for them to develop their argument for the first time in reply, thereby depriving the plaintiffs of an opportunity to respond. *See generally SRVR, LLC v. Neidoni*, No. 3:18-CV-050-CHB, 2020 WL 201052, at *6 (W.D. Ky. Jan. 13, 2020) ("It is generally inappropriate to raise new issues in a reply brief because the non-moving party will not have a chance to respond." (citations omitted)).

Given the unclear and undeveloped arguments of the parties, the Court cannot possibly conduct a thorough and complete analysis of the standards recited above. Because the parties' arguments on this claim are wholly undeveloped, the Court will not consider this claim and will

56

deny the Whitley County Defendants' motion to the extent they seek summary judgment on it. *See Members Heritage*, 2023 WL 4876383, at *13. Put simply, the Court will not do the parties' work for them. *See, e.g., Brown v. Astrue*, No. 09-387-HRW, 2010 WL 4878866, at *3 (E.D. Ky. Nov. 24, 2010) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)).

However, the Court will deny the Whitley County Defendants' motion on this specific clam—that is, the § 1983 *Monell* liability claim against Whitley County—without prejudice as to the defendants' ability to file a subsequent motion for summary judgment that specifically addresses the standard and law recited above and specific facts in support. The Court will allow normal response and reply times.

### E.  Plaintiffs' § 1983 Claim Against Southern Health Partners, Inc.

From the best the Court can tell, Plaintiffs also bring a § 1983 claim against Southern Health Partners, Inc. based on similar allegations supporting the municipal liability claim against Whitley County. *See* [R. 46, ¶ 79]. True, a private corporation that provides health care services to prison inmates may be liable under § 1983, but "only when execution of the private contractor's policy or custom inflicts the alleged injury." *Perry v. Corizon Health, Inc.*, No. 17–2489, 2018 WL 3006334, at *1 (6th Cir. June 8, 2018) (citing *Monell*, 436 U.S. at 694; *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)). Thus, "a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the [private contractor] was the moving force behind the deprivation of the plaintiff's rights." *Id.* (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)) (cleaned up). Such claims have failed to survive a motion to dismiss where the plaintiff's complaint failed to allege any facts showing that the private contractor had a policy, practice, or custom resulting in the violation of the plaintiff's constitutional rights. *Id.* at *2.

57

In the present case, Southern Health Partners, Inc. did not seek dismissal of this claim through a motion to dismiss, and it does not address this claim in its Motion for Summary Judgment. *See* [R. 97]. As a result, the Court will not consider it. However, the Court finds it difficult to identify allegations in the First Amended Complaint that would support this claim, i.e., that Southern Health Partners, Inc. had a policy, practice, or custom resulting in the violation of Burnette's constitutional rights. *See* [R. 46, ¶ 79]. Given the lack of allegations and evidence on the current record concerning this claim, the Court will allow Southern Health Partners, Inc. to file a subsequent motion for summary judgment that specifically addresses this claim—that is, the *Monell* liability claim asserted against Southern Health Partners, Inc.—and the standard and law recited above. The Court will allow normal response and reply times.

### F. Plaintiffs' Supervisory Liability Claim Against Defendants Whitley County, Brian Lawson, and Southern Health Partners, Inc.

Plaintiffs also bring a claim for vicarious responsibility and respondeat superior liability against Defendants Whitley County, Brian Lawson, and Southern Health Partners, Inc. *See* [R. 46, ¶¶ 90–91 (Count V)]. Plaintiffs allege that these defendants "are liable for their employees' violations of [Burnette's] state and common law rights pursuant to the doctrines of vicarious liability and respondeat superior."[16] *Id.* ¶ 91.

For their part, Defendants Whitley County and Lawson seem to conflate this claim (Count V) with Plaintiffs' municipal liability claim against Whitley County (Count I). To the extent they address supervisory liability at all, they do so in a single sentence after addressing the *Monell*

---

[16] While Plaintiffs reference "state and common law rights" in the First Amended Complaint, [R. 46, ¶ 91], their response brief indicates that their vicarious liability claim is based on the alleged constitutional violation at issue in their deliberate indifference claim. *See* [R. 126, p. 44]. Indeed, in that single-paragraph argument, they cite to a single case, in which the Sixth Circuit considered a § 1983 claim against a municipality. *See id.* (citing *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). The Court therefore understands that, to the extent Plaintiffs seek to impose vicarious liability on Whitley County, Lawson, or Southern Health Partners, Inc., their claim is based on the alleged constitutional violation at issue in the § 1983 deliberate indifference claim.

58

claim, stating only that Plaintiffs "fail[] to state any other state law basis for asserting claims of vicarious liability upon the County and its Jailer." [R. 121-1, p. 49]. Then, in their reply, they argue that they are not "vicariously liable under the theory of respondeat superior as they were not the moving force behind the injury." [R. 133, p. 20]. This statement again indicates to the Court that they conflate the supervisory liability claim with the *Monell* claim. *See supra* Section III(D). Defendant Southern Health Partners, Inc., for its part, does not address this claim at all. *See generally* [R. 97]. Accordingly, the Court finds that the parties' arguments on Count V are wholly undeveloped, and the Court need not consider this claim further. *See, e.g.*, *Members Heritage*, 2023 WL 4876383, at *13.

Regardless, while the parties do not adequately address this claim, the law is clear that a municipality, like Whitley County, "cannot be liable under a theory of respondeat superior; it can only be held liable for 'its own wrongdoing," as already discussed. *Helphenstine*, 60 F.4th at 323 (quoting *Morgan*, 903 F.3d at 565); *see also Monell*, 436 U.S. at 690 (explaining that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory"). Moreover, while Plaintiffs reference "vicarious liability" and "respondeat superior" in their response brief, it is clear they rely on Whitley County's "own wrongdoing," that is, its alleged policy of inadequate training or supervision, which they raise in Count I of their First Amended Complaint, and which the Court has already discussed. *See supra* Section III(D). Accordingly, to the extent Plaintiffs seek to rely on a theory of vicarious liability and respondeat superior against Whitley County, the Court will grant summary judgment in favor of the county on that claim (Count V).

However, it is possible for Plaintiffs to bring a supervisory-liability claim against Jailer Lawson in his individual capacity. To do so, they "must show that [Lawson] was actively involved

59

in offensive conduct, and that his conduct caused [Burnette's] injuries." *Helphenstine*, 60 F.4th at

321 (citing *Crawford v. Tilley*, 15 F.4th 752, 761–62 (6th Cir. 2021)). In other words, they must

show that Lawson, as a supervisory official, "at least implicitly authorized, approved or knowingly

acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* (quoting *Crawford*,

15 F.4th at 761) (internal quotation marks omitted). "This requires active unconstitutional conduct

by the supervisor because supervisory liability will not attach for a failure to act." *Id.* (citing

*Crawford*, 15 F.4th at 761); *see also Phillips*, 2021 WL 1220997, at * 14 ("The Sixth Circuit has

explained, 'Supervisory liability under § 1983 cannot attach where the allegation of liability is

based upon a mere failure to act.'" (quoting *Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012))).

However, Plaintiffs clearly rely on the failure to act, and specifically the failure to train and

supervise jail staff, as the basis for this supervisory-liability claim. [R. 126, p. 44]. They do not

point to any evidence that Lawson "directed any subordinate to act in a way that violated

[Burnette's] rights," nor do they cite any evidence "that [Lawson] authorized or acquiesced in any

unconstitutional conduct." *Helphenstine*, 60 F.4th at 321; *see also Phillips*, 2021 WL 1220997, at

*14 ("There are simply no facts that could lead a reasonable juror to find either [defendant]

encouraged the incident or the misconduct or participated in any way in the delay of medical care

to [the decedent]."). Indeed, in their one-paragraph argument, they do not cite any evidence of

record, nor any legal authority that would support this theory of liability against Lawson. *See*

[R. 126, p. 44]. As such, the Court will grant summary judgment in favor of Lawson on Count V,

the supervisory-liability claim.

   As for Southern Health Partners, Inc., they do not make any arguments relating to Count V,

and Plaintiffs likewise did not address the vicarious liability claim against this defendant. *See*

*generally* [R. 97]; [R. 126]; [R. 131]. However, the law is clear that such claims cannot proceed.[17] *See Perry*, 2018 WL 3006334, at *1 ("[A] private corporation providing health care services to prison inmates[] cannot be held liable under § 1983 on the basis of respondeat superior or vicarious liability." (citations omitted)). As such, the Court will grant summary judgment on the supervisory liability or respondeat superior claim (Count V) against Southern Health Partners, Inc.

### G.  Plaintiffs' State Law Claims

Plaintiffs bring the following state law claims: negligence and gross negligence (Count II, against all Defendants); wrongful death under KRS § 411.130 (Count III, against all Defendants); outrage, or intentional infliction of emotional distress (Count IV, against all Defendants); and loss of parental consortium (Count VI, against all Defendants). [R. 46, ¶¶ 83–89, 92–93].

As an initial matter, the Court notes that, in Kentucky, the tort of outrage (or intentional infliction of emotional distress)

> is intended as a "gap-filler," [providing] redress for extreme emotional distress where traditional common law actions do not. Where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action.

*Bennett v. Malcomb*, 320 S.W.3d 136, 137 (Ky. Ct. App. 2010) (quoting *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001)). Here, Plaintiffs' claim for outrage is based on the same conduct supporting their other traditional tort claims, namely, negligence. *See* [R. 46, ¶¶ 83–84, 97–89]. And Plaintiffs point to no evidence suggesting that "the conduct was intended only to cause extreme emotional distress." *Bennette*, 320 S.W.3d at 137. As such, it appears that a claim

---

[17] Again, to the extent Plaintiffs seek to impose vicarious liability on Southern Health Partners, Inc., the Court understands that their claim (Count V) is based on the alleged constitutional violation at issue in the § 1983 deliberate indifference claim.

for outrage is not appropriate. *Id.*; *see also Lawrence v. Madison Cnty.*, 176 F.Supp.3d 650, 676–77 (E.D. Ky. 2016).

The Whitley County Defendants raise this issue in their motion, albeit only briefly. *See* [R. 121-1, pp. 46–47]. Plaintiffs wholly fail to address the issue, arguing only that they have presented enough facts to establish the elements of an outrage claim. [R. 126, pp. 43–44]. The Court therefore understands that Plaintiffs do not dispute that the tort of outrage is only a "gap-filler" and must be dismissed where recovery could be sought under a traditional common law tort and the conduct at issue was not intended to only cause emotional distress. Regardless, the law is clear on this issue. *See, e.g.*, *Bennett*, 320 S.W.3d at 137.

Accordingly, the Court will grant summary judgment as to all defendants on the claim of outrage (Count IV). Having narrowed the state law claims to negligence and gross negligence (Count I), wrongful death (Count II), and loss of parental consortium (Count VI), the Court now turns to the parties' arguments.

### 1. Plaintiffs' State Law Claims Against Claxton and the Individual Whitley County Defendants, in their Individual Capacities

To the extent Plaintiffs assert these remaining state law claims against the individual Whitley County Defendants and Claxton, the Court understands those defendants are sued in both their individual and official capacities. *See id.* The Court discusses the official capacity state law claims below. *See infra* Section III(G)(2). As for the state law claims against these defendants in their individual capacities, Claxton and the individual Whitley County Defendants first argue that they are entitled to qualified immunity. [R. 92-1, pp. 16–17]; [R. 121-1, pp. 49–51].

### a. Qualified Immunity

The doctrine of qualified immunity "protects public officers and employees sued in their individual capacities from 'damages liability for good faith judgment calls made in [ ] legally

62

uncertain environment[s].'" *Franklin*, 115 F.4th at 478 (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). In Kentucky, "[q]ualified official immunity applies to [public] officers who perform '(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (quoting *Yanero*, 65 S.W.3d at 522) (internal quotation marks omitted).

A discretionary act is one that "involve[s] the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* (quoting *Yanero*, 65 S.W.3d at 522) (internal quotation marks omitted). However, "qualified immunity does not protect employees 'for the negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Id.* (quoting *Yanero*, 65 S.W.3d at 522). "Once the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (citation omitted); *see also Schell v. Young*, 640 S.W.3d 24, 45–46 (Ky. Ct. App. 2021) (applying this burden shifting analysis when evaluating a motion to dismiss).

Claxton and the Whitley County Defendants do little to engage with this standard. *See* [R. 92-1 pp. 16–17]; [R. 121-1, pp. 49–51]. Indeed, the Whitley County Defendants primarily argue that they are immune to the extent Plaintiff asserts state law claims against the County and the officers in their *official* capacities, an argument which the Court addresses below. [R. 121-1, pp. 44–45]; *see also infra* Section III(G)(2). To the extent they address qualified immunity for the officer-defendants in their *individual* capacities, they argue that "there is no evidence that the Whitley County Defendants' actions were taken in bad faith, malicious, or willful." [R. 121-1, p. 51]. The Whitley County Defendants do not cite to any evidence of record or legal authority,

and they spend no more than three sentences on this issue. *See id.*

To the extent the Whitley County Defendants seek to "adopt by reference" the motion for summary judgment filed by Claxton, [R. 121-1, p. 1 n.1], they gain little ground. Beyond summarizing his involvement (without citing to record evidence), Claxton argues only that "[t]he record indicates that Defendant Claxton did not perform or fail to perform any act or function in any manner that could be construed as negligent. Further, the record is devoid of any proof that Defendant Claxton failed to exercise a ministerial duty." [R. 92-1, p. 17]; *see also* [R. 129, p. 10 (repeating these statements and again failing to cite record evidence or legal authority)]. These statements, unsupported by citations to the record or legal authority, wholly fail to address whether Claxton (or any other officer-defendant) was performing a discretionary act or function in good faith and within the scope of his or her discretionary authority. *See Franklin*, 115 F.4th at 478 (reciting three-part standard). Moreover, such conclusory statements, made without citation to evidence of record or any legal authority, are insufficient to succeed on summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." (citations omitted)); *Bruin v. Meko*, No. 14–CV–57–HRW, 2015 1061578, at *5 (E.D. Ky. Mar. 10, 2015) ("At the summary judgment stage, Bruin must do more than rely on conclusory statements." (citations omitted)).

Given the undeveloped arguments of Claxton and the individual Whitley County Defendants, the Court need not consider their qualified immunity arguments further. *See Members Heritage*, 2023 WL 4876383, at *13. Nevertheless, the Court will briefly address the merits of their qualified immunity positions.

As an initial matter, the Court notes that, to the extent Plaintiffs assert that "[p]roviding

medical care to Burnette in this case cannot be considered discretionary," [R. 126, p. 43], they cite no authority for support. Moreover, each officer-defendant had to determine the appropriate level of care for Burnette (e.g., whether it was necessary to call the nurses or emergency services), or in other words, whether he was experiencing a medical emergency, based on their personal observations. Under these specific facts, the Court finds that the acts at issue were discretionary in nature. *See Coleman v. Smith*, 405 S.W.3d 487, 494–95 (Ky. Ct. App. 2012) (finding that, despite policy prohibiting the admission of an arrestee if the arrestee showed evidence of a drug overdose, the deputy jailer's evaluation of the arrestee, and determination that he was not overdosing, was a discretionary act); *Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 641 (Ky. Ct. App. 2011) (finding deputy jailer engaged in discretionary acts where he had to make decisions regarding an inmate's suicide risk based on his personal observations).

As already explained, qualified immunity protects public employees who perform such discretionary acts in the scope of their authority, and so long as they are performed in good faith. *Franklin*, 115 F.4th at 478 (quoting *Yanero*, 65 S.W.3d at 522) (internal quotation marks omitted). The parties do not dispute that the officer-defendants were acting within the scope of their authority. Thus, having resolved the initial question of whether the acts at issue were discretionary, the Court next considers whether they were performed in good faith.

In a similar case involving the death of a pretrial detainee, the decedent's estate sued certain corrections officers and the jailer for, among other things, deliberate indifferent under § 1983 and negligence under Kentucky common law. *See Bryant v. Hensley*, No. 0: 22-018-DCR, 2023 WL 3743571, at *1 (E.D. Ky. May 31, 2023). Applying the post-*Brawner* recklessness standard applicable to pretrial detainees, the district court found that the plaintiff had pointed to enough evidence to overcome the subjective element of her deliberate indifference claim with respect to

65

three of the officer-defendants. *Id.* at *8. As for the jailer-defendant, however, the plaintiff's § 1983 claim failed to survive summary judgment. *Id.* at *9. The Court found that the plaintiff had failed to identify "any relevant conduct of [the jailer]" other than his alleged failure to implement certain policies, *id.* at *11, and the plaintiff had failed to allege that the jailer had "participated in the events related to the claim." *Id.* at *9.

The Court then considered whether the defendants were entitled to qualified immunity on the state law claims. *Id.* at *10–11. As to the three officer-defendants, the district court explained,

> To overcome the protection afforded by qualified immunity, the plaintiff bears the burden of demonstrating that the defendants acted in bad faith. *See* [*Yanero*, 65 S.W.3d at 534]. The plaintiff may meet this burden by showing that the defendants violated "a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective unreasonableness; *or* [that] the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* Where, as here, resolution of the issue is heavily dependent on the same disputed material facts as a constitutional claim under § 1983, the plaintiff will be found to have satisfied her burden. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (citing *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009)); *Reed v. Campbell Cnty., Ky.*, 2022 WL 3449476 (E.D. Ky. Aug. 17, 2022), [*vacated in part on other grounds in Reed v. Campbell Cnty., Ky.*, NO. 2:20-CV-158 (WOB-CJS), 2022 WL 22891014 (E.D. Ky. Oct. 20, 2022)]. As a result, [the three officer-defendants] are not entitled to qualified immunity with respect to the plaintiff's claim of negligence.

*Bryant*, 2023 WL 3743571, at *11.

As for the jailer-defendant, however, the district court found him entitled to qualified immunity. *Id.* The district court again noted that the plaintiff had failed to identify "any relevant conduct of [the jailer]" other than his failure to implement certain policies, and a supervisor's decision to implement certain policies or training is a discretionary function under Kentucky law. *Id.* (citation omitted). Moreover, the plaintiff has wholly failed to explain how the jailer's "alleged conduct (or failure to act) was outside the scope of his authority and/or constitutes bad faith." *Id.*

On appeal, the Sixth Circuit affirmed the district court's reasoning. *See Bryant v. Hensley*,

66

No. 23-5608, 2024 WL 1180440, at \*4 (6th Cir. 2024). The Sixth Circuit agreed that "the bad-faith and deliberate-indifference inquiries contain overlapping components." *Id.* For instance, "[t]he bad-faith inquiry turns on whether the defendants violated a 'clearly established right which a person in the [defendants'] position presumptively would have known was afforded to a person in the plaintiff's position.'" *Id.* (quoting *Yanero*, 65 S.W.3d at 523). Because a jury could reasonably decide that the officer-defendants violated a clearly established right, "[i]t [was] not a large step to say that a triable issue of fact likewise exists of whether [those officer-defendants] acted in bad faith under Kentucky law." *Id.*; *see also Martin*, 712 F.3d at 963 ("Qualified immunity does not protect the officers here. As resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims.").

A similar analysis can be conducted here for the officer-defendants against whom the claims for § 1983 deliberate indifference survived (Joan Caudell, McClure, Huddleston, Claxton, and Henry), and Lawson. As just explained, Plaintiffs can satisfy their burden of demonstrating that the defendants acted in bad faith, and are therefore not shielded by qualified immunity, by "showing that the defendants violated 'a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position.'" *Bryant*, 2023 WL 3743571, at \*11 (quoting *Yanero*, 65 S.W.3d at 534). Here, with respect to Joan Caudell, McClure, Huddleston, Claxton, and Henry, "resolution of the issue is heavily dependent on the same disputed material facts as [the plaintiffs'] constitutional claim under § 1983," and as a result, "the plaintiff[s] will be found to have satisfied [their] burden." *Id.* (citations omitted). Accordingly, the Court finds that Joan Caudell, McClure,

67

Huddleston, Claxton, and Henry are *not* entitled to qualified immunity, and it will deny their motion to the extent they seek summary judgment on that ground.

As for Lawson, the jailer, the Court has already explained that Plaintiffs have failed to identify any evidence suggesting that Lawson was deliberately indifferent for failing to seek medical care for Burnette or that he otherwise responded inappropriately to Burnette's condition. *See supra* Section III(A)(1)(a)(ii). Instead, when discussing the subjective component of their § 1983 claim, Plaintiffs' primary argument is that Lawson, as jailer, failed to adequately train his employees on how to respond to medical emergencies. *See* [R. 126, pp. 37–38]. But "[i]t is well-settled under Kentucky law that a supervisor's decisions on the content of policies and training is a discretionary function." *Bryant*, 2023 WL 3743571, at *11 (citation omitted). And the plaintiffs have "made no effort to explain why [Lawson's] alleged conduct (or failure to act) was outside the scope of his authority and/or constitutes bad faith." *Id.* As such, Lawson is entitled to qualified immunity on the state law claims, and the Court will grant his motion to the extent it seeks summary judgment on those grounds.

This leaves for the Court's consideration the qualified immunity arguments for Defendants Jimmy Caudell and Taylor. As with the other defendants, Plaintiffs could have satisfied their burden of demonstrating bad faith by "showing that the defendants violated 'a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in [Burnette's] position.'" *Bryant*, 2023 WL 3743571, at *11 (quoting *Yanero*, 65 S.W.3d at 534). But here, as already explained, the evidence of record, even when viewed in the light most favorable to the plaintiffs, fails to support Plaintiffs' § 1983 deliberate indifference claim against these two defendants. *See supra* Section III(A)(1)(a)(ii). Plaintiffs do not point to any other evidence to suggest bad faith. Accordingly, on

68

the record before the Court, the Court finds that Defendants Jimmy Caudell and Taylor and are entitled to qualified immunity on the state law claims. The Court will therefore grant their motion to the extent they seek summary judgment on the state law claims, as against these two individual defendants, in their individual capacities.

### b. Merits

As for whether the Court should grant summary judgment on any of the state law claims against the remaining defendants *on their merits*, the Court notes that Claxton does not substantively address the merits of any of the state law claims. *See* [R. 92-1]. His only argument on the merits of the state law claims appears in a conclusory fashion at the end of his motion:

> There are no facts supporting any of the claims asserted against Defendant Claxton. Although claimed, there is no showing that his defendant violated any duties owed to Mr. Burnette or acted in any manner which caused harm to Mr. Burnette, disregarded any serious medical need or otherwise failed to respond to a medical emergency.

*Id.* at 18. With this argument being wholly undeveloped, the Court declines to consider it. *See Members Heritage*, 2023 WL 4876383, at *13. As such, all of the state law claims against Claxton (with the exception of the outrage claim, *see supra* Section III(G)) will survive summary judgment.

For their part, the Whitley County Defendants address only the merits of the negligence/gross negligence and outrage claims. *See* [R. 121-1, pp. 45–47]. As already discussed, the Court will grant summary judgment on the outrage claim as to all Defendants. *See supra* Section III(G). As for the negligence/gross negligence claim, the Whitley County Defendants correctly note that, under Kentucky law, negligence "requires a showing of duty, breach of duty, and resulting injury." *Webb v. Jessamine Cnty. Fiscal Court*, 802 F.Supp.2d 870, 888 (E.D. Ky. Aug. 5, 2011) (quoting *Smith v. Franklin Cnty.*, 227 F. Supp. 2d 667, 682 (E.D. Ky. 2002)) (internal quotation marks omitted); *see also* [R. 126-1, p. 45]. As for the first element, the

69

defendants also acknowledge that "Kentucky law 'imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate.'" *Lawrence v. Madison Cnty.*, 176 F. Supp. 3d 650, 679 (E.D. Ky. 2016) (quoting *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 479 (Ky. 2006)).

As for whether there was a breach of the duty, and whether any such breach caused injury, the Whitley County Defendants spend no more than five sentences, combined, on these issues. [R. 121-1, p. 46]. Regarding a breach of the duty of care, they argue only that the Whitley County Defendants' "duty to provide a safe environment do [sic] not extend to diagnosing the severity of medical conditions," and instead, the duty "was satisfied when steps were taken to isolate Mr. Burnette and report his condition to medical staff." *Id.* They cite no evidence of record nor any legal authority for support. And, importantly, they do not address facts relating to specific defendants, nor do they make any defendant-specific arguments. As a result, the Court is left guessing as what specific arguments and evidence apply to which individual officer-defendant. Regarding causation, these defendants argue that the plaintiffs "cannot prove that any supposed breach of duty caused Mr. Burnette's death" because "the evidence indicates that it was his own ingestion of methamphetamines and other drugs that led to his demise." *Id.* Again, the defendants fail to cite any evidence or legal authority to support these otherwise conclusory statements.

The same deficiencies appear in their argument regarding gross negligence. In a single sentence, they argue that "[t]he Whitley County Defendants routinely monitored Burnette and promptly responded when the need arose and thus did not act with a reckless disregard for Burnette's safety." *Id.* Clearly, these alleged facts, unsupported by any citations to the record, do not apply to each of the individual Whitley County Defendants. *See supra* Section I.

70

Given these deficiencies, the Court finds that the Whitley County Defendants' arguments on this issue are wholly undeveloped, and the Court will not do the parties' work for them. *See, e.g.*, *Brown*, 2010 WL 4878866, at *3. The Court will therefore deny the Whitley County Defendants' motion to the extent they seek summary judgment on the merits of Plaintiffs' negligence/gross negligence claim (Count II). The Court notes, however, that the standard applicable to the § 1983 deliberate indifference claims is one of recklessness, meaning the plaintiffs were required to "prove '*more than negligence* but less than subjective intent.'" *Brawner*, 14 F.4th at 596 (emphasis added) (quoting *Castro*, 833 F.3d at 1071).

None of the parties have specifically addressed the claims for wrongful death (Count III) or loss of parental consortium (Count VI), and those claims likewise survive summary judgment, to the extent they are asserted against Joan Caudell, McClure, Huddleston, Claxton, and Henry in their individual capacities.

### 2. Plaintiffs' State Law Claims Against Claxton and the Individual Whitley County Defendants, in their Official Capacities, and Whitley County

As noted above, Plaintiffs, in their First Amended Complaint, also appear to assert the state law claims against the individual Whitley County Defendants and Claxton official capacities. *See* [R. 46, ¶¶ 83–89, 92–93]. From the best the Court can tell, the state law claims are also asserted against Whitley County. *See id.* The Whitley County Defendants argue that the individual officers cannot be sued for such claims in their official capacity because they are protected by the doctrine of official immunity, and the county is likewise protected by sovereign immunity. [R. 121-1, pp. 49–51]. In response, Plaintiffs do not acknowledge these arguments, nor do they make any arguments relating to state law claims against the county or these individual defendants (or Claxton) in their official capacities. [R. 126, p. 42]. The Court therefore understands that Plaintiffs

71

have abandoned their state law claims to the extent they were asserted against the county and the individual Whitley County Defendants and Claxton in their official capacities. Moreover, the law is clear that the county is cloaked with sovereign or governmental immunity, as are the county officials, to the extent they are sued in their official capacities. *See Webb*, 802 F.Supp.2d at 886–87. The Court will therefore grant Claxton and the Whitley County Defendants' motions as to these claims.

### 3.   Plaintiffs' State Law Claims Against the SHP Defendants

The SHP Defendants' motion addresses only the deliberate indifference claims against Mullis and Hounshell. *See* [R. 97].[18] As a result, Plaintiffs' response does not specifically address the state law claims against the SHP Defendants. *See* [R. 126, pp. 43–44].[19] Yet, in the SHP Defendants' reply brief, they argue for the first time that they are entitled to summary judgment on the state law negligence and outrage claims. *See* [R. 131, pp. 4–5]. A party generally may not raise an argument for the first time in a reply brief, however. *See SRVR, LLC*, 2020 WL 201052, at *6 ("It is generally inappropriate to raise new issues in a reply brief because the non-moving party will not have a chance to respond." (citations omitted)). As such, the Court will not consider the remaining state law claims against the SHP Defendants.

### H.  Loss of Future Earning Capacity

In the "Damages" section of the First Amended Complaint, Plaintiffs assert that they are "entitled to recover . . . the loss of Aaron Burnette's power to labor and earn money." [R. 46, ¶ 95]. In their motion, the Whitley County Defendants acknowledge that "[t]he measure of damages for

---

[18] Surprisingly, in their motion, the SHP Defendants state that "[t]he only claim against these Defendants is for deliberate indifference." [R. 97, p. 1].

[19] While Plaintiffs' arguments on the state law claims reference "Defendants" generally, the Court understands that Plaintiff referred only to the Whitley County Defendants and Claxton. *See* [R. 126, pp. 43–44].

a wrongful death in [Kentucky] is the value of the destruction of the power of the decedent to earn money." [R. 121-1, p. 52 (quoting *Adams v. Davis*, 578 S.W.2d 899, 902 (Ky. Ct. App. 1979)) (internal quotation marks omitted)]. However, they argue, "there has been no competent evidence to prove Mr. Burnette's ability to earn money." *Id.* In response, Plaintiffs argue that "[a] jury should be able to determine whether to award monies for the destruction of his earnings capacity." [R. 126, p. 44]. The Whitley County Defendants offer no argument in reply. *See* [R. 133].

The Court finds that the parties' arguments on this issue are wholly undeveloped, and the Court will not do the parties' work for them. *See, e.g.*, *Brown*, 2010 WL 4878866, at *3. Moreover, at this stage of the proceedings, there has been no finding of liability on any claim, and this issue, which goes to the measure of damages, therefore appears to be premature. As such, the Court will deny the Whitley County Defendants' motion to the extent they seek summary judgment on this issue.

## I. Plaintiffs' Claims Against Unknown Individual Defendants 1–3 and Unknown Entity Defendants 1–3

Plaintiffs' First Amended Complaint also names as defendants "Unknown Individual Defendants 1–3" and "Unknown Entity Defendants 1–3." [R. 45, pp. 1–3]. Under Federal Rule of Procedure 4(m), these defendants must be served within ninety days from the date the complaint is filed, and the failure to do so may result in their dismissal. Fed. R. Civ. P. 4(m). Here, it has been well over ninety days since the First Amended Complaint was filed, discovery has concluded, and there is no evidence of service of process on these individuals. The Court will therefore dismiss these defendants pursuant to Rule 4(m). And while such dismissals are typically without prejudice, the Court may dismiss an unknown defendant *with* prejudice under Rule 4(m) where the statute of limitations has passed. *See DeLong v. Arms*, 251 F.R.D. 253, 255 (E.D. Ky. 2008). Here, the statute of limitations on each of Plaintiffs' remaining claims has passed. *See id.* (noting that a one-year

73

statute of limitations applied to claims under § 1983 and to negligence claims under Kentucky law); *Estate of Stewart v. Flowers*, No. 2024-CA-1011-MR, 2026 WL 478385, at *4, *7 (Ky. Ct. App. Feb. 20, 2026) (explaining that a wrongful death claim must be brought within one year of accrual, and a loss of parental consortium claim also has a one-year statute of limitations). The Court will therefore dismiss the claims against "Unknown Individual Defendants 1–3" and "Unknown Entity Defendants 1–3" with prejudice.

IV.    **CONCLUSION**

For the reasons set forth above, the Court will grant in part and deny in part the motions for summary judgment filed by Claxton, [R. 92], the Whitley County Defendants, [R. 121], and the SHP Defendants. [R. 97].

At this time, then, the following claims remain: Plaintiffs' § 1983 claim against Joan Caudell, McClure, Huddleston, Claxton, and Henry, in their individual capacities, and the individual SHP Defendants (Count I); Plaintiffs' § 1983 *Monell* liability claims against Whitley County and Southern Health Partners, Inc. (Count I); Plaintiffs' state law claims for negligence/gross negligence (Count II), wrongful death (Count III), and loss of parental consortium (Count VI) against Joan Caudell, McClure, Huddleston, Claxton, and Henry, in their individual capacities, and the SHP Defendants.

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Motion for Summary Judgment filed by Defendant Steve Claxton, [**R. 92**], is **GRANTED IN PART** and **DENIED IN PART**.

   a. The motion is **GRANTED** as to Plaintiffs' § 1983 claim for deliberate indifference to the extent it is asserted against Claxton in his official capacity (Count I); Plaintiffs' state law outrage claim (Count IV); and

74

Plaintiffs' remaining state law claims to the extent they are asserted against Claxton in his official capacity (Counts II, III, and VI).

  b. The motion is **DENIED** in all other respects.

2. The Motion for Summary Judgment filed by the SHP Defendants, [**R. 97**], is **GRANTED IN PART** and **DENIED IN PART**.

  a. The motion is **GRANTED** as to Plaintiffs' claim of supervisory liability and respondeat superior to the extent it is asserted against Southern Health Partners, Inc. (Count V); and Plaintiffs' state law outrage claim (Count IV).

  b. The motion is **DENIED** in all other respects, and is specifically **DENIED without prejudice** as to the § 1983 municipal liability claim against Southern Health Partners, Inc.

3. The Motion for Summary Judgment filed by the Whitley County Defendants, [**R. 121**], is **GRANTED IN PART** and **DENIED IN PART**.

  a. The motion is **GRANTED** as to Plaintiffs' § 1983 claim for deliberate indifference to the extent it is asserted against Defendants Jimmy Caudell, Brian Lawson, and Zane Turner in their individual capacities (Count I); Plaintiffs' § 1983 claim for deliberate indifference to the extent it is asserted against the individual Whitley County Defendants in their official capacities (Count I); Plaintiffs' claim of supervisory liability and respondeat superior to the extent it is asserted against Whitley County and Defendant Lawson (Count V); Plaintiffs' state law outrage claim (Count IV); Plaintiffs' remaining state law claims to the extent they are asserted against Defendants Jimmy Caudell, Brian Lawson, and Zane Turner in their individual

75

capacities (Counts II, III, and VI); and Plaintiffs' remaining state law claims to the extent they are asserted against Whitley County and the individual Whitley County Defendants in their official capacities (Counts II, III, and IV).

   b. The motion is **DENIED** in all other respects, and is specifically **DENIED without prejudice** as to the § 1983 municipal liability claim against Whitley County.

4. Pursuant to Rule 4(m), all claims against "Unknown Individual Defendants 1–3" and "Unknown Entity Defendants 1–3" are **DISMISSED WITH PREJUDICE**.

5. On or before **April 30, 2026**, the parties **SHALL** meet and confer regarding the remaining claims and file a Joint Status Report advising as to whether any party requests that the matter be referred to a magistrate judge for further settlement conferences, or whether the parties agree to engage in private mediation. If the parties do not request that the matter be referred for a settlement conference or advise that they are engaging in private mediation, they shall advise the Court as to whether they intend to file any renewed motions for summary judgment. The Court will thereafter set a briefing schedule. Lastly, if the parties do not request that the matter be referred for settlement conference, they do not wish to engage in private mediation, and they do not wish to file any renewed motions, they shall provide three potential trial dates between July 6, 2026 and August 28, 2026, and an estimated length of trial.

This the 31st day of March, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

76